693 A.2d 917

VELOP, INC., PLAINTIFF, v. HARRY KAPLAN AND THE ESTATE OF TOBEY KAPLAN, DEFENDANTS–RESPONDENTS/CROSS–APPELLANTS, AND STAVOLA CONTRACTING COMPANY, INC., STAVOLA MANAGEMENT COMPANY, INC., STAVOLA ASPHALT COMPANY, INC., STAVOLA COMPANY, JOSEPH C. STAVOLA, JR., FRANK STAVOLA, SR., JOHN W. STAVOLA, SR., JAMES J. STAVOLA, SR., KEVIN NOLAN, EDWARD LANE, AND LEE PARISI, DEFENDANTS–APPELLANTS/CROSS–RESPONDENTS, AND TINTON FALLS CONTRACTING CO., INC., C.H. SUTPHEN, INC., STAVOLA REALTY COMPANY, MICHAEL J. STAVOLA, A/K/A "JACK" STAVOLA, PRIME–A EXCAVATORS, INC., A/K/A PRIME A. EXCAVATION, INC., A/K/A PRIME A. CONSTRUCTION CO., LOUIS F. PETRUZZELLI, WILLIAMSBURG ASSOCIATES, INC., DOMINIC MARTELLI, SALVATORE J. MARTELLI, THOMAS KENNEL, DENNIS M. CRAWFORD, LEO J. ECKMANN, ROBERT H. BABB, HERB KUSHNER, DAVID KOCHEL, THE TOWNSHIP OF OCEAN, MONMOUTH COUNTY, NEW JERSEY, AND JEROME KAPLAN, EDWARD KAPLAN, AND ABE BARSHOP, AS EXECUTORS AND TRUSTEES OF THE ESTATE OF TOBEY KAPLAN, DECEASED, DEFENDANTS.

HARRY KAPLAN, JEROME KAPLAN, EDWARD KAPLAN, AND ABE BARSHOP, AS EXECUTORS AND TRUSTEES OF THE ESTATE OF TOBEY KAPLAN, DECEASED, THIRD–PARTY PLAINTIFFS, v. JAN EDELSTEIN, AS EXECUTRIX OF THE ESTATE OF BENJAMIN EDELSTEIN, GARRY SCHECHER, LOUIS LERNER AND MANFRED E. DEMENUS, THIRD–PARTY DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued April 29, 1997—Decided May 19, 1997.

34

Before Judges MICHELS, MUIR, Jr. and COBURN, JJ.

*Patrick J. Perrone* argued the cause for appellants (*McCarter & English*, attorneys; *Andrew T. Berry* and *Arthur D. Loring*, of counsel; *Mr. Perrone, Mr. Berry* and *Mr. Loring*, on the brief).

*Andrew Kyreakakis* argued the cause for respondents (*Ambrosio, Kyreakakis & Dilorenzo*, attorneys; *Mr. Kyreakakis*, of counsel and on the brief).

The opinion of the court was delivered by

COBURN, J.S.C. (temporarily assigned).

Harry and Tobey Kaplan owned a small farm. While in their nineties, they entered written contracts which gave rise to this complex litigation: one set of contracts involved the sale of their farm to Velop, Inc., (Velop) which, in turn, contracted to sell to another developer, Williamsburg Associates, Inc., (Williamsburg), and the other set of contracts granted Stavola Contracting Company, Inc., (SCC) the right to mine the farm for soil, which it did to a degree far in excess of that allowed by its contract. After discovering the excessive mining, the purchasers terminated the real estate contracts and Velop sued.

On this appeal, we are directly concerned only with the relations between the Kaplans and the Stavola defendants, the latter consisting of defendants SCC, Stavola Management Company, Inc., (SMC), Stavola Asphalt Company, Inc., (SAC), Stavola Company (SC); the four Stavola brothers, James, John, Joseph, and Frank; two key Stavola employees, Kevin Nolan and Edward Lane; and Lee Parisi, another Stavola employee.

After a four month jury trial which involved claims for breach of contract, negligence, fraud, conversion, tortious interference with contract, and violation of the federal and state RICO statutes, the jury rejected the RICO actions, but on the other causes of action awarded the Kaplans verdicts against the Stavola defendants for $5,925,000 in compensatory damages and, with the exception of Lee Parisi, for $1,002,500 in punitive damages. More specifically, the jury found SCC liable for breach of contract, fraud, and conversion. It found James and John liable for fraud. It found all the Stavola defendants, except Joseph and Frank and Lee Parisi, liable for negligence, and it found all the Stavola defendants liable for tortious interference with contractual rights. SMC stipulated that it would be responsible for payment of the judgments against its employees Nolan, Lane, and Parisi.

On the verdict form, the jury indicated that the compensatory damages would not be different "if any count was dropped," and that the amount of those damages for breach of contract was the same as the damages under the various tort theories. The jury attributed fault to the Stavola defendants in the following percentages: SCC (80%); SMC, SAC and SC, Joseph and Frank (1% each); James and John (2% each); Nolan, Lane, and Parisi (¼% each). Additional assessments of fault against other defendants not involved in this appeal when added to the above percentages totalled 100%.

Punitive damages were assessed against the Stavola defendants as follows: SCC ($325,000); James and John ($300,000 each); Joseph and Frank ($35,000 each); Nolan ($3,500); and Lane ($4,000).

Plaintiff Velop also received favorable verdicts against the Stavola defendants based on tortious interference with contractual rights and negligence; however, that aspect of the dispute was settled after the filing of the Stavola notice of appeal. A default judgment was entered against defendants Louis F. Petruzzelli and his company, Prime–A Excavators, Inc. All other claims were settled before or during trial.

The trial court reduced the Kaplans' compensatory damage award from $5,925,000 to $2,180,000, but left standing the punitive damage awards totaling $1,002,500; it denied the Stavola defendants' motions for judgments n.o.v. or a new trial. The Stavola defendants appeal, seeking judgment or a new trial; and the Kaplans cross-appeal, seeking reinstatement of the jury's award of compensatory damages. We affirm the liability verdicts, except for the verdicts against Parisi (who was not proven to have been at fault) and the verdict based on common law fraud (which was outside the pleadings). We reverse the judgment on damages and remand for a new trial on damages only, subject to the Kaplans' acceptance of a *remittitur.*

## I

The Kaplan farm, consisting of seventy-one acres, was located on Bowne Road in the Township of Ocean, Monmouth County. With the exception of one five acre parcel on which the house and outbuildings sat, the remaining lands were undeveloped and contained sandy soil useful for landfill and the manufacture of asphalt materials. At the times pertinent to this case, Tobey Kaplan, also known as Tillie, was in her nineties and her husband Harry was approaching one hundred years of age. By the mid–1980's their health had substantially deteriorated. Their attorney, Benjamin Edelstein, attended to legal matters on their behalf.

In 1977, the Kaplans entered into their first two soil mining contracts for the farm with defendant SCC. In 1979, the parties entered into another mining contract. However, SCC's application for a soil removal permit was denied by the township because soil removal was no longer permitted in the municipality. Litigation with the township resulted in judicial recognition that the Kaplans were entitled to have soil removed from their property as the continuation of a non-conforming use. Consequently, in 1985 SCC renewed its application for a soil removal permit. The permit issued on March 18, 1985.

On April 25, 1985, the Kaplans and SCC entered their fourth soil mining contract for the farm. This contract provided for the sale of approximately 301,000 cubic yards of soil for approximately $150,000. The exact price was to be based on the amount of soil removed at the rate of fifty cents per cubic yard. SCC was obliged to conduct its operations in accordance with the township soil removal permit, contracts it entered into with the township in relation thereto, and the applicable statutes, ordinances and local regulations. The soil removal was to be conducted in conformance with a grading map prepared by William D. Ayers, and referred to throughout this litigation as the "Ayers Map." The map divided the property into four sections, numbered 1, 2, 3, and 4.

The initial and subsequent soil removal permits issued by the Township of Ocean allowed for the removal of soil only from section 1 on the Ayers Map.

On August 14, 1986, the Kaplans contracted to sell their farm, excluding the five acre parcel on which the house and outbuildings stood, to plaintiff Velop for $5,000,000. Closing was contingent upon the ability of the purchaser to obtain preliminary site plan approval of the entire property and final site plan and subdivision approval of "the first section of the development."

On September 12, 1986, as a consequence of the Kaplan–Velop contract, the Kaplans and SCC amended the 1985 soil removal contract to provide that it would terminate no later than March 1988, and that if the sale of the farm was not consummated and the farm was again offered for sale, SCC would have a right of first refusal on the same terms as those offered by any prospective purchaser.

On November 16, 1987, the Kaplans agreed to sell the five-acre parcel to Velop for $1,000,000 with the same contingencies as applied to the balance of the land.

On December 30, 1987, Velop contracted to sell the entire Kaplan farm to Williamsburg for approximately $11,000,000. The agreement contemplated a 120 lot subdivision for individual resi-

dences. That agreement is quite complex. However, for present purposes, we need only note that two of its contingencies were the ability of the seller to receive preliminary subdivision approval for the entire property by September 1, 1988 and final subdivision approval by January 1, 1989.

As previously noted, the Kaplans contracted for soil removal with only one defendant, SCC, but the jury imposed liability not only on that corporation, but also on some of the other Stavola entities and individually to varying degrees on the four Stavola brothers and on three Stavola employees. In light of some of the arguments pressed on appeal, it is appropriate to explain the brothers' relations in running their enterprises.

Only one of the brothers, James, testified during the trial. He related that all four brothers owned equal positions in each entity. They met every morning for one to two hours in their office. They shared one desk. Each morning they would discuss the business of their companies. Important decisions were made jointly. Nothing of importance would happen without them being aware of it. That testimony was confirmed by Nolan, a long-time employee, who stated that he reported to the Stavola brothers and that they ran the companies; their authority was "equal" with no division of responsibility among them. This intensely close relationship was also confirmed by the brothers' attorney, Arthur D. Loring, who described them as the "decision makers." Throughout the trial, witnesses were often permitted without objection to testify about these individual defendants as if they were one. There was no evidence to suggest that any of the brothers was at any time acting for his own benefit to the detriment of the others. Consequently, we note that the jury had an ample basis to infer that the relevant knowledge of each brother was held by the other brothers and that the actions of each were based on joint decisions.

We turn next to the evidence regarding the excessive removal of soil from the farm. The Stavolas took approximately 775,000 cubic yards of soil, measured on an in-ground basis, or 1,000,000

cubic yards, measured on a truck-load basis. Most of the soil came from outside of section 1 on the Ayers Map in violation of the soil removal permits. The amount taken was also over three times the amount to which the Stavolas were entitled under their contract with the Kaplans.

The Stavolas employed Petruzzelli to mine and transport the soil to their asphalt manufacturing plant. Their attorney knew that Petruzzelli had been previously convicted of fraudulent disposition of property, false swearing, possession of a motor vehicle with an altered identification number, obtaining goods under false pretenses, and embezzlement. James admitted that he understood Petruzzelli had a criminal record. The jury was entitled to infer that the brothers knew at least as much about that record as did their attorney. The Stavolas concede in their reply brief that some of them "might have been negligent in hiring Petruzzelli and in failing to supervise his work."

Mining of the Kaplan farm began in the fall of 1986. In June, 1987, the mining shifted from section 1 to sections 2 and 4 on the Ayers Map. On August 20, 1987, Township Engineer Robert H. Babb wrote to SCC raising numerous complaints about the project, including the illegal mining of section 2. Nevertheless, this mining continued until approximately February, 24, 1988, when Mr. Babb ordered the operation to cease. By then, approximately 565,000 cubic yards of soil, measured on an in-ground basis, had been removed.

One other area of the farm was mined thereafter, a ridge which separated the Kaplan farm from the Seaview property. The Stavolas had been mining the Seaview property for soil immediately before they began operations on the Kaplan farm in 1986. The ridge was a large L-shaped mound of soil approximately thirty to forty feet high. The mining was conducted by Petruzzelli, the same person used by the Stavolas to mine the rest of the farm. It took place in the spring and early summer of 1988. The Stavola field crews, under the supervision of Lane, had staked the area for soil removal. When the township discovered the removal

of the ridge, it filed a municipal court complaint against Petruzzelli. On August 29, 1988, he was fined $500 and ordered to pay restitution in the amount of $2,154.60. Within three months the Stavolas transmitted to Petruzzelli a check payable to his company in the amount of $2,154.60. Despite the denials of the Stavolas, based on these circumstances, the jury was entitled to infer, as it apparently did, that the soil from the ridge was removed at the direction of the Stavolas and transported to their plant. The evidence indicated that the amount of soil removed from this area totalled about 200,000 cubic yards.

The effect of the overmining on the land sale contracts was hotly disputed at trial. The Stavolas contend the deals fell apart for other reasons: a decline in the real estate market; an unwillingness to permit the Stavolas to restore the property; Velop's failure to apply for final subdivision approval and its "voluntary" termination of the contract with Williamsburg; and the Kaplans' "knowing" allowance of the excessive mining. While their position finds some support in the record, with the exception of their assertion of the Kaplans' complicity in the overmining, there was strong evidence, which the jury was entitled to credit, to support the Kaplans' contention that the overmining was the crucial factor leading up to the termination of the land sale contracts.

For example on October 17, 1986, an attorney for Velop, wrote to John, SCC and the Kaplans' attorney, indicating awareness of the soil removal contract and his client's concerns about the overmining:

> Our client has reason to believe that Stavola has mined the 301,000 cubic yards and that any further soil removal would, therefore, be without right under the contract and a violation of the rights of my client as contract purchaser.
>
> We are currently doing verification in the field but wish to put you on notice of what we believe to be the case so that no soil will be removed beyond the 301,000 cubic yards allowed.

Also, by letter of November 14, 1988, the attorney for Williamsburg wrote to Velop, describing the problems caused by the overmining and detailing the costs of repair, which his client said amounted to a minimum of $1,404,603. He concluded the letter by

stating the contract was voidable because of the overmining and demanding a return of the deposit or substantial modification of the contract price. Velop refused to reduce the price. According to the trial testimony of Frank W. Hahne, an engineer employed by Velop, the cost of restoration would have been between $4,500,-000 and $5,407,000.

Furthermore, when plaintiff obtained preliminary subdivision approval on October 24, 1988, and demanded payment from Williamsburg, pursuant to its contract, for $150,000, Salvatore Martelli, a principal of Williamsburg, refused to authorize payment because of the loss of the soil, which his company had expected to be able to remove and sell.

There were further negotiations (described at great length by numerous witnesses during the trial) among various parties, including the Stavolas, directed at reaching some accord as a result of the overmining. In the end, they came to naught.

The balance of the relevant evidence will be described in relation to the specific points raised by each party.

## II

The Stavolas contend there was insufficient evidence to support the jury's finding of tortious interference with contractual rights. Therefore, they say the trial court erred in refusing to grant their motions for judgment notwithstanding the verdict or a new trial.

A motion for a new trial based on the quality of the evidence may only be granted if, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." *R.* 4:49–1(a).

In *Dolson v. Anastasia*, 55 *N.J.* 2, 258 *A.*2d 706 (1969), the Court explained the difference between a new trial motion and a motion for judgment notwithstanding the verdict, pointing out that in the latter case the "judicial function ... is quite a mechanical one. The trial court is not concerned with the worth, nature or

extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." *Id.* at 5–6, 258 *A.*2d 706. On the other hand, with respect to a new trial motion, the Court said:

> The trial judge's obligation on a motion for a new trial because the verdict is said to be against the *weight* of the evidence is quite a different and more difficult one. It is clear that such a motion may be properly granted although the state of the evidence would not justify the direction of a verdict. *Franklin Discount Co. v. Ford, supra* (27 *N.J.*, at 490, 143 *A.*2d 161). A process of evidence evaluation,— 'weighing'—, is involved, which is hard indeed to express in words. This is not a *pro forma* exercise, but calls for a high degree of conscientious effort and diligent scrutiny. The object is to correct clear error or mistake by the jury. Of course, the judge may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a thirteenth and decisive juror. It was said in *Kulbacki,* '[w]hat the trial judge must do is canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict * * *.' 38 *N.J.*, at 445, 185 A.2d 835. This does not mean that the test is the same as on a motion for judgment. Rather what was meant was that in ruling on a motion for a new trial, the trial judge takes into account, not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, so-called 'demeanor evidence', and the intangible 'feel of the case' which he has gained by presiding over the trial.

> [*Id.* at 6.]

The standard governing an appellate court's review of a trial court's decision of a new trial motion is "essentially the same as that controlling the trial judge." *Id.* at 7. While the reviewing court must consider the significant firsthand observations of the trial judge regarding the witnesses, the duty remains to determine whether a miscarriage of justice occurred. *Ibid.* Since we are satisfied that a new trial on liability is not warranted based on the quality of the evidence, we need not discuss the more restrictive standard applicable to motions for judgment notwithstanding the verdict.

We begin our consideration of the validity of the Kaplans' claim for tortious interference by reference to *Harris v. Perl,* 41 *N.J.* 455, 197 *A.*2d 359 (1964). Speaking for a unanimous Court, Chief Justice Weintraub described in broad terms the essential nature of this tort:

The law protects a man in the pursuit of his livelihood. True, he cannot complain of every disappointment; others too may further their equal interests, and if the means are fair, the advantage should remain where success has put it. But if the act complained of does not rest upon some legitimate interest or if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated, the ensuing loss should be redressed.

Hence one who unjustifiably interferes with the contract of another is guilty of a wrong. And since men usually honor their promises no matter what flaws a lawyer can find, the offender should not be heard to say the contract he meddled with could not have been enforced.

[*Id.* at 461, 197 *A.*2d 359.]

In *Printing Mart–Morristown v. Sharp Electronics*, 116 *N.J.* 739, 563 *A.*2d 31 (1989), the Court detailed the elements of a claim for tortious interference with contractual relations, indicating the proofs had to show (1) the existence of the contract (or the prospective economic relationship); (2) interference which was intentional and with malice; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages. *Id.* at 751–52, 563 *A.*2d 31. The Court emphasized that malice in this context did not mean "ill will toward" the victim. "Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Id.* at 751, 563 *A.*2d 31. On the issue of causation, the Court noted that the victim need only prove that had there been no interference, there was " 'a reasonable probability that the victim of the interference would have received the anticipated economic benefits.' " *Ibid.*

One further point needs to be made with respect to the second element, the intent to interfere with malice. Implicit in the Supreme Court's definition of malice is acceptance of the principle that the requisite intent may be either a specific intent to interfere with the contract or the taking of improper action with knowledge that interference will probably result. In *Printing Mart, supra,* the Court indicated that the approach taken by the *Restatement (Second) of Torts* (1979) accorded with its view of the nature of this tort. *Printing Mart–Morristown, supra,* 116 *N.J.* at 752, 563 *A.*2d 31. And on this subject the relevant comment in the *Restatement* has this to say:

> *j. Intent and purpose.* The rule stated in this Section is applicable if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition. . . . It applies also to intentional interference, as that term is defined in 8A, in which the actor . . . knows that the interference is certain or substantially certain to occur as a result of his action. The rule applies, in other words, to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.
>
> [*Restatement (Second) of Torts,* § 766, comment *j.* (1979).]

Guided by these principles of law, we turn to the Stavola defendants' contention that their only intent was to mine the Kaplan farm in accordance with the soil removal contracts and permits and the Ayers Map.

As a preliminary matter, we note that the existence of the land sale contracts and the Stavola defendants' knowledge thereof shortly after they were signed was not seriously disputed and is clear from the evidence. Also, although the Stavolas denied that the excessive soil removal was the cause of the Kaplans' loss of their contract with Velop, there was substantial evidence, some of which is outlined above, indicating the contrary. That the Kaplans were damaged, a point dealt with in detail later in this opinion, is unquestionable. Thus, the only element of tortious interference with contractual rights that the Stavolas put in issue is the question of intent as to each individual.

The Kaplan–SCC contract allowed for the removal of approximately 301,000 cubic yards of soil from section 1 on the Ayers Map. The work was to be concluded by March 1988. The Stavolas admit that at least 565,000 cubic yards of soil were removed from sections 1, 2, and 4. Furthermore, although Kevin Nolan, the Stavola's chief engineer, and the man directly in charge of this project, testified that he was given oral permission by the township engineer to mine section 2, the township engineer stated that he never gave such permission; and, indeed, he specifically wrote to the Stavolas in August 1987, advising that the mining of section 2 was improper without a resolution of the township governing body. Although Nolan claimed that he believed he was entitled to remove up to 454,080 cubic yards of soil, he was aware of the

lower limit set forth in the Kaplan–SCC contract. In October 1986 Velop had written to the Stavolas objecting, based on its contract, to the removal of more than 301,000 cubic feet of soil. After the township engineer ordered mining to cease in February 1988, Petruzzelli admittedly continued to remove soil from the ridge area of the farm which had been staked by Stavola field teams. Although the Stavolas deny complicity in that activity, there was substantial evidence of their involvement, including the reimbursement of Petruzzelli for the precise amount of money that the municipal court required him to pay in restitution for the mining of the ridge. Approximately 200,000 cubic yards of soil was removed from the area of the ridge.

Edward Lane, the Stavolas' chief surveyor on the site, knew as early as February 1987 that substantial overmining had occurred but nonetheless continued to have his field survey crews set stakes for further soil removal, including on the area of the ridge, which he knew was entirely excluded from the Ayers Map grading plan.

James testified that he learned of overmining on the farm as early as February 20, 1987, and that he and his brothers met with Lane to discuss the problem. He also indicated that he inspected the farm on eight to ten occasions during the two year period of 1987 and 1988.

The Stavolas had a substantial motive for interfering with the Kaplan–Velop contract. The evidence indicated that soil for the manufacture of asphalt is quite valuable. The Stavolas were paying the Kaplans $.50 a cubic yard, and were supposed to pay the township $.10 a cubic yard. They claimed they paid Petruzzelli $4.00 a cubic yard, and the evidence indicated that it could be sold by them for $8.00 a cubic yard. The Kaplan farm was particularly useful as a source of asphalt-grade soil because it was located within five miles of one of the Stavolas' asphalt manufacturing plants. Lee Parisi testified that the proximity of the farm enabled the Stavolas to compete more effectively for road construction projects involving asphalt. From 1986 to 1988, the Stavola plants produced about 1.2 million tons of asphalt, which

required over 500,000 tons of sand. Parisi further indicated that at the time the Kaplan contract was made the quality of the Seaview sand was "going down." The Stavolas further expressed their interest in the farm by negotiating for a right of first refusal should the initial land contract fail.

Keeping in mind Chief Justice Weintraub's reference to sharp dealing and overreaching as the basis for this tort, we also should note that the Stavolas only paid the Kaplans for the removal of 331,158 cubic yards of soil. Payment was apparently based upon the amount of soil in each truckload. Measured in that manner, it would appear that approximately one million cubic yards of soil was removed from the farm, or almost 670,000 cubic yards more than the amount allowed by the contract. At $.50 per cubic yard, that would have given the Kaplans the right to an additional $335,000. In addition, of course, the Ayers Map grades were knowingly disregarded, resulting in grave damage to the Kaplan property.

The Stavola defendants respond to all this by claiming that their only intent was to remove soil and that they had no desire to interfere with the land sale contracts. Of course, the Stavolas' successful negotiation for a right of first refusal, coupled with their intense interest in the Kaplan farm as a source of material, suggest otherwise. Moreover, the Stavolas knew that the two purchasers, Velop and Williamsburg, were strongly objecting to the excess soil removal. Nonetheless they persisted in their course of action, even to the point of removing the ridge, which was not even on the Ayers Map grading plan, after the township had ordered soil mining on the farm to stop.

The entire scenario demonstrates that the Stavola defendants knew that their actions were substantially certain to cause, as they did, interference with the Kaplans' contractual relations. Therefore, with one exception, we find no basis for overturning the jury's determination that the Stavola defendants were all guilty of tortious interference with the Kaplan–Velop contract.

■ The one exception is defendant Lee Parisi. Unlike Nolan and Lane, he was not involved in the soil removal process and he was not familiar with the Ayers Map or the terms of the soil removal contract and permits. His job was manager of the Stavola asphalt plants. In that capacity, he tested the quality of the sand which was to be removed from the Kaplan farm. We perceive no basis, and none is offered in the Kaplans' brief, which would support a determination that he was liable for this tort.

### III

The Stavola defendants' discussion of the negligence verdict assumes that Joseph, Frank and Parisi were determined by the jury to have been liable for this tort. In fact, in assessing comparative fault for negligence, the jury, in answer to question 29 on the verdict form, gave 75% to SCC, 2% each to James and John, 8% to Nolan, 1% to Lane, and 12% to the Township of Ocean (and its employees). No percentage of fault was assessed against Joseph, Frank, or Parisi, even though in answer to an earlier question (number 19) the jury had indicated that they were at fault for negligence. The Stavola defendants do not contend there was insufficient evidence of negligence with respect to SCC, or James or Nolan.

■ In light of the intensely close business relationships among the Stavola brothers, we are satisfied that the liability of John was properly treated by the jury as no different than the liability of James, both of whom could be perceived as negligent in hiring Petruzzelli and in permitting him to continue removing sand despite his failure to follow the Ayers Map grades. With respect to Lane, the jury may well have found him to be negligent for staking the ridge for soil removal despite his knowledge that the ridge was completely outside the areas designated in the Ayers Map for soil removal. In addition, he staked section 2 for soil removal despite the facts that he had in his file the Kaplan–SCC contract, which indicated that only section 1 was to be mined, and the township engineer's letter of August 20, 1987, asserting that

the mining of section 2 was illegal without approval of the township governing body. These acts could also have been viewed as negligence.

 Relying upon *Higgins v. Owens–Corning Fiberglas Corp.,* 282 *N.J.Super.* 600, 608–10, 660 *A.*2d 1252 (App.Div.1995), where the court reversed and remanded for a new trial because the jury had assessed a percentage of liability to an entity which should not have been on the verdict sheet, appellants contend that a new trial on negligence is required here for the same reason. However, as pointed out above, the jury only assessed percentages of fault based upon negligence against parties for whom there was evidence of negligence. Therefore, the Stavola defendants have failed to offer any basis on which the negligence verdicts should be overturned.

 The Stavola defendants also contend no reasonable jury could have concluded that the Kaplans were not comparatively negligent in permitting mining from sections 2 and 4. They say "it is indisputable that the Kaplans were aware of this mining." The difficulty with this argument is that Mr. Kaplan testified, just before reaching his 100th birthday, that he could not see from his house where the soil was actually coming from and that he did not know that the Stavolas were mining from areas prohibited by the contract. Needless to say, there is nothing to suggest that he or his wife would have had any way of knowing that the Stavolas were also digging far below the grades allowed by the Ayers Map. We are thus satisfied the jury had a more than adequate basis for finding that neither Harry nor Tobey Kaplan failed to use reasonable care to protect their property from the Stavolas. *Stoelting v. Hauck,* 32 *N.J.* 87, 101, 159 *A.*2d 385 (1960).

## IV

 The jury found the following liable in fraud: Benjamin Edelstein, SCC, James and John. SCC and the two Stavolas contend the trial court erred in allowing the Kaplans to have the issue of fraud submitted to the jury since their cross-claim did not

specifically allege fraud as a separate cause of action. They also contend the Kaplans failed to prove fraud because there was no evidence that when the contract for soil removal was assigned the Stavolas intended not to keep their promise to mine only approximately 301,000 cubic yards of soil from section 1 on the Ayers Map.

The Kaplans' cross-claim for fraud was purportedly based upon their incorporation of the allegations contained in plaintiff's complaint. Although the complaint does contain a separate count for common law fraud, the allegations contained therein are against the Kaplans and their attorney. Furthermore, the cross-claim does not incorporate those counts by reference. The RICO counts of the complaint make numerous charges of fraudulent conduct including the proposition that, among other things, the Stavolas and the Kaplans, acting in concert, always intended to have more soil removed from the farm than the amount set forth in the soil removal contract. But there is no suggestion that the Stavolas were defrauding the Kaplans in that respect. Neither side indicates that common law fraud was adverted to by the Kaplans' attorney in his opening as a cause of action against the Stavolas.

During trial, the first colloquy on common law fraud occurred at the charge conference. According to the trial court and plaintiff's attorney, on February 22, 1994, when ruling on motions for summary judgment, the court "specifically stated to the parties that the claims of common law fraud remain." Counsel for the Stavolas noted that the common law fraud counts of the complaint were directed only at the Kaplans and their attorney. However, the attorney for plaintiff then expressed his understanding that "the allegations of fraud were basically that Stavola entered into the contract with the Kaplans all along intending to overmine." The Stavolas' attorney objected and the plaintiff decided to "withdraw" its fraud claim, whether pleaded or not, against the Stavolas. The trial court then said the fraud claim would be limited to the Kaplans as against the Stavolas and others. The attorney for the Stavolas said, "I ask for a directed verdict on that one too.

They never articulated that to us." The trial court ruled for the Kaplans because "there is enough evidence in the record at least for a jury issue as to the Kaplans." The Stavolas' attorney objected at this point on the ground that there was no evidence in the record that the Kaplans had relied upon a fraudulent statement. The trial court ruled that reliance was implicit since the promise which it was alleged the Stavolas intended from the beginning to breach was the promise set forth in the agreement to mine no more than approximately 301,000 cubic yards from section 1 on the Ayers Map.

▮▮▮▮ Generally, amendment of pleadings is liberally allowed, subject to the sound discretion of the court. *Du–Wel Products v. U.S. Fire Ins.*, 236 *N.J.Super.* 349, 364, 565 *A.*2d 1113 (App.Div. 1989), *certif. denied*, 121 *N.J.* 617, 583 *A.*2d 316 (1990). Furthermore, when reviewing pleadings to determine whether a cause of action has been stated, courts are charged with the responsibility of searching "the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim. . . ." *Di Cristofaro v. Laurel Grove Mem'l Park*, 43 *N.J.Super.* 244, 252, 128 *A.*2d 281 (App.Div.1957). Nonetheless, we are satisfied that the Stavolas named by the trial court on this claim as defendants were not on notice that the Kaplans were claiming common law fraud against them.

The addition of an unpled cause of action just prior to summations is clearly inconsistent with *Sun Source, Inc. v. Kuczkir*, 260 *N.J.Super.* 256, 262–64, 615 *A.*2d 1280 (App.Div.1992), *certif. denied*, 133 *N.J.* 439, 627 *A.*2d 1144 (1993). Nor is this a case where an issue not raised by the pleading was tried by consent or without objection by the parties. As the court said in *Fluoro Electric Corp. v. Smith Transport Ltd.*, 58 *N.J.Super.* 287, 294, 156 *A.*2d 153 (App.Div.1959), *aff'd o.b.*, 32 *N.J.* 277, 160 *A.*2d 627 (1960), "[t]o sustain a judgment on issues not raised by the pleadings and pretrial order the court must be satisfied that such issues were recognized by the parties and actually tried." In the

instant case, neither requirement was met. Therefore, the fraud verdict is vacated.

## V

The Stavola defendants have raised three matters as plain error regarding the trial court's jury charge which, we note, consumed over eighty-eight pages of the transcript. A fourth matter respecting the charge is asserted as having been raised below, although we have been unable to find any reference to it in the record.

The Stavola defendants contend the charge on tortious interference with contractual rights was confusing because at the end it referred to negligence concepts. To say the least, the argument is strained. The reference to negligence law does appear at "the end" of (or after) the tortious interference charge, but it also appears at the *beginning* of the negligence charge. There is no justification for appellants' present assumption, unexpressed below, that the jury was led to believe that the discussion of the law of negligence did not begin precisely when the court began discussing negligence.

Next, they contend the trial court erred in failing to define the word "intent" in the charge on tortious interference with contractual rights. In fact, the charge tracked Model Jury Charge 3.16, which accords with the case law. *Leslie Blau Co. v. Alfieri*, 157 *N.J.Super.* 173, 384 *A.2d* 859 (App.Div.), *certif. denied*, 77 *N.J.* 510, 391 *A.2d* 523 (1978).

The third complaint is somewhat difficult to analyze since it is presented without citation of law. The trial court instructed the jury to allocate responsibility among the defendants found liable to the Kaplans. Without objection, the trial court further explained to the jury that in arriving at the percentages to be assessed against each of the Stavola corporations they were to exclude any percentage of fault assessed against the individual Stavola employees. The Stavola defendants contend that that was

an impossible task because the liability of the corporations was vicarious only, as a matter of *respondeat superior*. Therefore, they contend the jury "must have double counted some portion of the liability (*i.e.*, the liability attributed to [the individuals] must have been included in the 82% liability attributed to the corporate defendants)."

The difficulty with this contention is that the liability of the corporate defendants was not merely vicarious. For example, there were claims, and evidence to support them, that the corporations were negligent in hiring Petruzzelli and in failing to adequately supervise the mining of the farm. Furthermore, two of the properly supported and successful claims, breach of contract and conversion, were directed solely at the major corporate defendant, SCC.

In *De Los Santos v. Saddlehill, Inc.*, 211 *N.J.Super.* 253, 264, n. 2, 511 *A.2d* 721 (App.Div.1986), *certif. denied*, 107 *N.J.* 101, 526 *A.2d* 175 (1987), we observed that the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.4, "does not apply where the liability of one of the defendants is *solely* vicarious." (emphasis added.) We reached that conclusion because the Comparative Negligence Act should be read in *pari materia* with the Joint Tortfeasors Contribution Law, *N.J.S.A.* 2A:53A–1 to –5, which provides in section 1, "A master and servant or principal and agent shall be considered a single tortfeasor." But, as noted, in this case there are bases for corporate liability independent of *respondeat superior*.

The Stavola defendants do not argue that contractual fault may not be compared to tortious fault under the Comparative Negligence Act, and in the circumstances of this case, where all the fault resulted in the same damages, as the jury so found, the trial court's approach appears to be fully in accord with the Supreme Court's decision upholding just such a comparison under the Act in *Dunn v. Praiss*, 139 *N.J.* 564, 576–78, 656 *A.2d* 413 (1995).

Thus, on this point we perceive no error and certainly no plain error. *R.* 2:10–2.

The Stavola defendants contend that they argued below for the trial court to relate the principles of law to the specific facts of the case. They do not indicate where in the transcript they did that. We cannot find any such criticism occurring after the charge was given to the jury. Before the charge conference, the trial court provided all counsel with a copy of the proposed charge. It was discussed for a full day, related in over 200 pages of transcript. Nowhere does there appear a request by counsel for any of the Stavola defendants to relate the law to the facts.

In claiming plain error on this point, appellants cite *Navarro v. George Koch & Sons, Inc.*, 211 *N.J.Super.* 558, 512 *A.*2d 507 (App.Div.), *certif. denied*, 107 *N.J.* 48, 526 *A.*2d 138 (1986), in which the court did say the following:

> In addition to setting forth the principles of law, the court must also relate the evidence to the necessary elements '... so that the jury may intelligently and correctly apply the law to the facts as its finds them.' *McCann v. Biss*, 65 *N.J.* 301, 303–304, n. 1 [322 *A.*2d 161] (1974).
>
> [*Id.* at 570.]

However, in setting forth that sound, general principle of law, neither *Navarro* nor *McCann* said or implied that the failure to relate the facts to the law would automatically require reversal. Indeed, in *McCann* the Supreme Court did not use the word "must", but, rather, indicated in *dictum* that this was something which "should" be done. *McCann v. Biss*, 65 *N.J.* 301, at 304, n. 1, 322 *A.*2d 161 (1974). Neither case disapproved of the holding in *Gross v. Grimaldi*, 64 *N.J.Super.* 457, 166 *A.*2d 592 (App.Div.), *certif. denied*, 34 *N.J.* 469, 169 *A.*2d 744 (1961) that a general charge "lacking specific adaption to the factual circumstances of the case ... would not in itself be sufficient grounds for reversal...." *Id.* at 462, 166 *A.*2d 592. Indeed, as the court said in *Navarro*, "[i]n the last analysis, it is a question of whether or not the jury was confused or misled." 211 *N.J.Super.* at 571, 512 *A.*2d 507. We recognize that in some contexts, such as products liability cases, the Supreme Court has indicated the trial court must be particularly careful to tailor the instructions to the particular factual situation, *Suter v. San Angelo Foundry & Mach.*

*Co.,* 81 *N.J.* 150, 176, 406 *A.*2d 140 (1979). Nor have we overlooked the fact that in *McCann* the Supreme Court specifically addressed the issue in the context of a charge on tortious interference with contractual rights, which it described as a "difficult" tort. 65 *N.J.* at 304, n. 1, 322 *A.*2d 161. However, in the circumstances of the instant case, we would not characterize the tort as difficult to understand. For it, in turn, was based on intentional violations of contract and conversion. No objection was taken to the charge as given, and we see no reason to recognize this matter as rising to the level of plain error. *R.* 2:10–2.

### *VI*

We now turn our attention to the $5,925,000 in compensatory damages awarded by the jury and thereafter reduced by the trial court to $2,180,000.

For convenience, we reiterate that the Kaplans contracted to sell their farm to Velop in 1986 and 1987 for $6,000,000. Velop contracted to sell the farm to Williamsburg on December 30, 1987 for approximately $11,000,000. The contracts were terminated, as a result of the Stavola defendants' conduct, in late 1988.

The evidence bearing on the subject of damages came essentially from three witnesses: the real estate appraisers, Norman J. Goldberg for the Kaplans and Anthony Graziano for the Stavolas, and Frank W. Hahne, a civil engineer, who testified about the cost of restoring the Kaplan farm to the grades laid out on the Ayers Map.

On direct examination Mr. Goldberg stated that as of December 1, 1993, the Kaplan farm was worth $3,745,000. However, that value was based on two assumptions: (1) that preliminary subdivision approval had been obtained; and (2) that "any conditions relating to overmining on this property would have been cured."

On cross-examination, Mr. Goldberg said that he had also appraised the property in 1989 as "raw" land and that at that time

it was worth "pretty close to about two million eight." This opinion had not been included in his expert report.

Mr. Hahne, the civil engineer, said that the cost of restoring the farm to Ayers Map grades would be between $4,500,000 and $5,407,000.

We note that acceptance of Mr. Goldberg's testimony on direct examination in relation to Mr. Hahne's opinions would indicate a negative value for this seventy-one acre farm in 1993 of between minus $755,000 and minus $1,762,000.

Mr. Graziano appraised the property as of November 1988. He placed a value on it of $6,800,000. However, he did not appraise the property from the point of view of either the Kaplans or Velop. Instead, he discussed the value of the land to Williamsburg. He said:

As of November 1988 the Williamsburg contract would have required [a] purchase price based on about 10 million 7 hundred thousand dollars for the approved subdivision. It was a hundred thousand dollars per lot. As of that time frame my analysis demonstrated a land value of about six point eight million dollars. Which would mean that there is about four million dollars difference between the contracted price and what the contributory value of that land would be to a development if proposed for that site. *Based on that it would appear that the land was overpriced ... by almost 40 percent....* If Williamsburg was a client of mine, recognizing where that market was moving, my recommendation would be to ... walk on the deal.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

[However], as of December 1987, the land value was reflected at about ten point five million dollars.... and there is no question that my recommendation to a client would have been to move forward with the development, that it was financially feasible.

He further explained that the drop in value from December 1977 to November 1988 was due to a severe change in market conditions.

If Mr. Graziano is correct with respect to his forty percent figure from the point of view of Williamsburg, it would appear logical to assume the same percentage would apply in relation to the Velop contract with the Kaplans. On that analysis, the property value from the Kaplans' point of view was $3,600,000

(sixty percent of $6,000,000) at the time of the termination of their contract due to the tortious activity of the Stavola defendants. That would indicate damages to them of the difference between the $6,000,000 contract price, less the $75,000 deposit and the $3,600,000 value of the property, or total damages of $2,325,000.

The trial court responded to these circumstances by ordering a reduction of the Kaplans' damages from $5,925,000 to $2,180,000. That figure was derived by subtracting from the jury award the Goldberg 1993 appraisal of $3,745,000. The trial court entered its order not by way of *remittitur* but rather by reference to *R.* 4:40–2. The trial court said:

> This is not a *remittitur* in that there is no option for a new trial, the damages being capped as a matter of law. This is done as a judgment notwithstanding the verdict pursuant to *R.* 4:40–2 as opposed to *R.* 4:49–1.... *See Caillouette v. City of New Orleans*, 534 *So.*2d 1373 (La.Ct.App. 4th Cir.1988).

Both sides object to the trial court's approach, and we agree that the trial court erred insofar as it ignored the use of *remittitur* and employed instead the concept of entering a judgment notwithstanding the verdict to set damages. The *Caillouette* case, on which the trial court relied, was based on a rule of practice peculiar to Louisiana which "authorizes the appellate court to render any judgment which is just, legal, and proper upon the record on appeal." *Id.* at 1376. Louisiana is not a common law state and, in any case, its rules of procedure obviously are not applicable here. In short, *R.* 4:40–2 does not provide authority for what the trial court did. However, the trial court was empowered to use the procedural device of *remittitur* under *R.* 4:49–1. For the reasons stated below, we are satisfied that *remittitur* may be employed here to avoid a long retrial of this case.

The history of the *remittitur* practice is described in *Fisch v. Manger*, 24 *N.J.* 66, 130 *A.*2d 815 (1957), where the Court concluded:

> [T]he practices of *remittitur* and *additur* violate none of our constitutional interdictions and, if fairly invoked, serve the laudable purpose of avoiding a further trial where substantial justice may be attained on the basis of the original trial.
> [*Id.* at 80, 130 *A.*2d 815.]

In *Taweel, et al. v. Starn's Shoprite Supermarket*, 58 *N.J.* 227, 276 *A.*2d 861 (1971), the Court further explicated the use of the practice of *remittitur* in these terms:

> The trial court's views necessitate a restatement of the true function of a remittitur. When there is adequate support for the jury's finding on liability and it appears only that the damages awarded were excessive, the remittitur device may be used and its use is encouraged to avoid a new trial. *Fritsche v. Westinghouse Electric Corp.*, 55 *N.J.* 322, 330–331 [261 *A.*2d 657] (1970). The term is used to describe an order denying defendant's application for a new trial on condition that the plaintiff consent to a specified reduction in the jury's award. *Fisch v. Manger*, 24 *N.J.* 66, 72 [130 *A.*2d 815] (1957). It may be employed only in cases where, if the plaintiff declines the reduction, the separate issue of liability having been clearly an properly decided, he must submit to a new trial as to damages. If however, the award of damages is so grossly excessive as to demonstrate prejudice, partiality or passion and thus to generate the feelings that the entire verdict was tainted, a remittitur is improper. The correct procedure in such a case is an order for a new trial on all issues.
>
> [*Id.* at 231, 276 *A.*2d 861.]

More recently, in *Caldwell v. Haynes*, 136 *N.J.* 422, 643 *A.*2d 564 (1994), the Court reiterated its commitment to *remittitur* as a positive alternative to a new trial on damages, whether employed initially by the trial court or later on by the appellate court:

> Remittitur denies a defendant a new-trial motion on the condition that a plaintiff consent to a specified reduction in the jury's award. *Henker v. Preybylowski*, 216 *N.J.Super.* 513, 516, 524 *A.*2d 455 (App.Div.1987). The practice of remittitur is encouraged at both trial and appellate levels in cases involving excessive damages. *Baxter, supra,* 74 *N.J.* at 595, 379 *A.*2d 225; *Fritsche, supra,* 55 *N.J.* at 330–31, 261 *A.*2d 657. The practice 'gives plaintiff the choices of accepting the reduced verdict or suffering a new trial on damages.' *Mulkerin v. Somerset Tire Serv., Inc.,* 110 *N.J.Super.* 173, 176, 264 *A.*2d 748 (App.Div.1970); *see Taweel, supra,* 58 *N.J.* at 231, 276 *A.*2d 861. However, the practice is available if the only issue is the quantum of damages, the claimant's right to relief is clear, and 'the verdict was not the result of compromise or otherwise tainted.' Sylvia B. Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 4:49–1 (1994).
>
> [*Id.* at 443, 643 *A.*2d 564.]

As a preliminary matter, we note that the erroneous and excessive assessment of compensatory damages by the jury in this case does not demonstrate prejudice, partiality or passion. Neither the trial court nor we perceive the liability verdict as tainted by the excessiveness of damages. The amount of damages was a complicated issue in this case, but the wrongs were so clearly

established under various theories that no one can doubt the Kaplans' entitlement to reasonable damages. Indeed, the Stavola defendants' counsel conceded as much in oral argument before this court.

The appropriate measure of damages for injury done to land is a complex subject and courts have responded to such claims in a great variety of ways depending upon the evidence in the particular case. Dobbs, *Remedies*, § 5.2 to § 5.16 at 310–34 (1973). However, in almost all cases one of two measures is employed:

> The first measure, and the one most commonly mentioned in the opinions, is the diminution measure. Under this measure the plaintiff is entitled to recover the difference in the value of his property immediately before and immediately after the injury to it, that, the amount his property has diminished in value as a result of the injury. The other measure awards the plaintiff the reasonable cost of restoring or repairing the damage.
>
> Each of these tests has a wide sphere of application, and the court's selection of one test or the other is basically an assessment of which is more likely to afford full and reasonable compensation.
>
> [*Id.* at 312 (footnotes omitted).]

In particular with respect to the restoration of land,

> [c]ourts tend to use the diminution test without hesitation in circumstances that suggest a very high restoration cost. This factor, probably more than any other, tends to influence the courts to choose the diminution test. Most courts follow the rule that repair costs, when used as a measure, may not exceed the diminution in value of the property.
>
> [*Id.* at 317 (footnotes omitted).]

The "familiar diminution rule is commonly used where sand or gravel is removed." *Id.* at 327 (footnote omitted).

Professor Dobbs goes on to point out that reasonable repair costs which exceed the diminution in value should be allowed in some circumstances where the property owner wishes to use the property rather than sell it. *Id.* at 317. That approach accords with New Jersey law. *Huber v. Serpico*, 71 *N.J.Super.* 329, 176 *A.2d* 805 (App.Div.1962) (homeowner permitted to recover the cost of restoring his property after shade trees tortiously removed even though the loss of the trees had not diminished the market value of his land.) The contrary assertion in *Barberi v. Bochinsky*, 43 *N.J.Super.* 186, 191, 128 *A.2d* 1 (App.Div.1956) relied upon

*Rempfer v. Deerfield Packing Corp.*, 4 *N.J.* 135, 72 *A.2d* 204 (1950), which, as shall appear, was later modified on this point by *525 Main Street Corp. v. Eagle Roofing Co. Inc.*, 34 *N.J.* 251, 168 *A.2d* 33 (1961) and *Berg v. Reaction Motors Div., Thiokol Chem. Corp.*, 37 *N.J.* 396, 181 *A.2d* 487 (1962).

In *525 Main Street Corp., supra,* a contract case wherein the Court allowed damages for repair of a defective roof, Chief Justice Weintraub wrote:

> [T]he general rule with respect to building contracts is that the disappointed owner may recover the costs of completing the promised performance or making necessary repairs, *unless under the facts it is impossible to do so or the costs of completion or repairs would constitute unreasonable economic waste, in which event reference would be made to the difference in value formula.*
>
> [*Id.* at 255, 168 *A.2d* 33 (citations omitted) (emphasis added).]

In *Berg, supra,* the rule of *525 Main Street Corp., supra,* was extended to the field of torts. Vibrations resulting from the defendant's testing of rocket engines had damaged many homes in the area, resulting in impaired foundations, seam openings and cracked floors, walls, ceilings, and other problems. The plaintiffs introduced expert testimony indicating the aggregate cost of repair for all plaintiffs was $25,605. The defendant's expert testified that on a diminution in value basis, the loss was a total of $3,700. The jury awarded the plaintiffs' figure and the Supreme Court affirmed. Speaking for the Court, Justice Jacobs had this to say:

> It seems to us that this approach makes good sense and will operate with special effectiveness under the circumstances such as those presented here. The repairs to the plaintiffs' homes.... simply entail the restoration of the homes to their condition immediately prior to the defendant's activities. *The plaintiffs are concerned with living in rather than selling their homes and, in all fairness, they should have the right to recover the reasonable cost of the necessary repairs without being subjected to the artificial burden of establishing that the diminution in the salable value of their homes was in a corresponding amount.*
>
> [*Id.* at 412 (emphasis added).]

More recently, in *Correa v. Maggiore,* 196 *N.J.Super.* 273, 285, 482 *A.2d* 192 (App.Div.1984), a case in which the jury had awarded repair costs of $33,000 with respect to a fraudulently procured contract for the sale of a home for $25,000, we reiterated the proposition that "the cost of repairs approach should not be

employed where ·... it would result in 'unreasonable economic waste.'" In reversing the judgment on that basis, we observed:

> By virtue of the age of the building and its present condition, the cost of reconstruction is not an appropriate measure of plaintiff's loss. This is so because the cost of repairs vastly exceeds the contract price and the probable market value of the property. It would be anomalous to compel defendant to provide plaintiff with what essentially amounts to a totally refurbished home, which would be a result far exceeding what is necessary to make plaintiff whole. Rather, the diminution in value caused by defendant's deceit better reflects plaintiff's actual loss and satisfies the reasonable expectations of the parties.
>
> [*Id.* at 285–86, 482 *A.*2d 192.]

With these governing principles in mind, we have no doubt that the proper measure of damages for the Kaplans in the circumstances of this case is the difference between the contract price and the market value of the property when the tortious activity was concluded in late 1988. The principle of avoiding economic waste, as set forth in *525 Main Street Corp., supra,* and *Correa, supra,* clearly requires rejection of the restoration costs as a measure of damages. That follows because on the Kaplans' evidence, restoration at a cost of $5,400,000 would result in a property worth only $3,745,000.

We also reject the Kaplans' contention that their damages may be measured under the conversion theory, pled only against SCC, by multiplying the retail value of the excess soil removed by its retail value of $8.00 a cubic yard. We reject that contention for a number of reasons, not the least of which is the fact that the value of the excess soil was included in the prices being paid for the farm by both Velop and Williamsburg. Moreover, generally, the value of soil taken in a conversion case is its worth in the ground (which in this case is concededly $.50 a cubic yard). *See Sanders v. Wilkerson,* 285 *N.C.* 215, 204 *S.E.*2d 17, 20 (1974); *Restatement (Second) of Torts,* § 927 (1979). Under section 927 of the *Restatement* and cases in some jurisdictions, if the converter has not acted in "good faith"[1] he is liable for the retail value,

---

[1] Comment *f* of the *Restatement* has this to say about an actor's good faith:

the price at which he can sell the product. *See* Dobbs, *Remedies, supra,* § 5.2 at 321-32. But that legal theory was not submitted to the jury in this case. Furthermore, the cases which allow the retail value to the converter as the measure of damages do so in lieu of punitive damages. *Id.* at § 5.5 In this case, punitive damages were of necessity separately assessed since they related not only to conversion, but also to tortious interference with contract and fraud. Thus, in this case the only proper and workable measure of damages was the diminution in value of the farm.

 On diminution in value, we can find no basis for accepting Mr. Goldberg's selection of December 1, 1993, as the appropriate date for appraisal. In saying that, we recognize that Williamsburg had placed a *lis pendens* on the property which stayed in place until some point during the trial. But the Kaplans' contention that the presence of the *lis pendens* interfered with their ability to sell the farm and thereby extended the time for measurement of their damages is unsustainable since there is no evidence they ever attempted a sale. In other words, there was no evidence that the *lis pendens* had proximately caused any damage. Thus, the proper measure of damages must be obtained by appraising the farm at the time of the loss in late 1988. A figure representing a value five years later has no legal significance. *Vines v. Orchard Hills, Inc.,* 181 *Conn.* 501, 435 *A.*2d 1022,

---

If the converter's conduct is not in good faith, as when he knows that the chattel is not his when he originally converts it or when he acquires the knowledge before he improves it, a special rule of damages awards to the owner the increase in value that the converter has contributed to the chattel. This rule originated by analogy to the action of replevin, in which the owner could recover back the specific chattel without compensating the converter for the increase in value. It has persisted largely because of a feeling on the part of the courts both that one who wilfully intermeddles with the chattel of another should proceed at his peril so far as any claim of his own for allowance or compensation for his acts is concerned and that an intentional converter should not have the prospect of profiting from his wrong.
[*Restatement (Second) of Torts,* § 927 comment *f* at 538 (1979).]

1029 (1980); *Georgia Power Company v. Hinson,* 179 *Ga.App.* 263, 346 *S.E.*2d 73, 78 (1986).

■ On cross-examination, Mr. Goldberg stated that he had valued the property as raw land in 1988, apparently before the damage was done, though that is not clear, and had found it to be worth roughly $2,800,000. But that figure is also not relevant since the Kaplans did not sell the farm as raw land. Their contract with Velop was expressly contingent on the latter obtaining subdivision approval.

■ This leaves us with the testimony provided by the Stavola defendants' expert, Mr. Graziano. He did assess the land on the proper basis in its post-tort condition in late 1988. His only mistake was to provide calculations from the point of view of Williamsburg rather than from that of the Kaplans. However, the central point he made was that as a result of a sudden worsening of market conditions after the contracts were made, the land was reduced in value to only sixty percent of its contract value from the vantage point of Williamsburg. Accepting that contention as true for purposes of *remittitur,* we can see no reason why the same percentage drop should not be applied to the Kaplan–Velop contract. On that theory, after the tort the land could be sold for $3,600,000. Deducting that sum, plus the $75,000 deposit, from the contract price of $6,000,000, the Kaplans suffered damages in the amount of $2,325,000. Since this sum is based on the Stavola defendants' own appraisal expert, they cannot reasonably complain about our using it for purposes of *remittitur.* Therefore, the Kaplans may have the option of accepting that amount as compensatory damages in lieu of a new trial on damages, less the $5,587.50 representing Lee Parisi's ¼% of the compensatory damages. This approach is in accord with *Kurak v. A.P. Green Refractories, Co.,* 298 *N.J.Super.* 304, 330–32, 689 *A.*2d 757 (App. Div.1997) and *Roland v. Brunswick Corp.,* 215 *N.J.Super.* 240, 245–46, 521 *A.*2d 892 (App.Div.1987).

*VII*

The Stavola defendants contend that the punitive damage awards must be reversed because they were not assessed in accordance with the procedure set forth in *Herman v. Sunshine Chem. Specialties, Inc.,* 133 *N.J.* 329, 346, 627 *A.*2d 1081 (1993), and because they were against the weight of the evidence and excessive. They also argue that whenever a court reduces compensatory damages there must be a new trial on the amount of punitive damages awarded by the jury.

Based upon the *remittitur* directed by us, the Stavola defendants would be responsible for compensatory damages, based on the percentages of fault found by the jury, as follows: SCC (80% or $1,783,530); the other two Stavola companies found liable (1% or $17,835.30 each); James and John (2% or $35,670.60 each); Joseph and Frank (1% each or $17,835.30 each); Nolan and Lane (¼% or $4,458.83 each).

As found by the jury, punitive damages were $325,000 against SCC $300,000 each against James and John; $35,000 each against Joseph and Frank; and, respectively, $4,000 against Lane and $3,500 against Nolan.

The parties stipulated to the following net worth figures: SCC (between 3.4 and 4.3 million dollars); James (between 8.2 and 10.3 million dollars); John (between 10.1 and 12.5 million dollars); Joseph (between 9.2 and 11.5 million dollars); and Frank (between 9.2 and 11.5 million dollars). While the procedure followed by the trial court was not precisely in accordance with *Herman, supra,* there was no objection below. Viewed from the point of view of plain error, *R.* 2:10–3, we perceive no prejudice to defendants. Although the trial court permitted the jury to decide liability for punitive damages during the first stage of deliberations, the evidence of the wealth of defendants and the amount of punitive damages were reserved for the second stage. *Herman* did not in the case before it and does not in this case require reversal for

technical deviation from the applicable statute, *N.J.S.A.* 2A:58C–5b.

The contention that an award of punitive damages was against the weight of the evidence is clearly without merit. *R.* 2:11–3(e)(1)(B), (E). The conduct of the Stavola defendants, as described above, reflected actual malice and numerous acts accompanied by a "wanton and willful disregard of the rights of" the Kaplans. *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 49, 477 *A.*2d 1224 (1984). They were well aware of the land contracts and the limits placed upon them by their contract with the Kaplans and by their agreements with the township. Here we are clearly confronted by defendants who were involved in "conscious wrongdoing." *Berg v. Reaction Motors Div., Thiokol Chem. Corp., supra,* 37 *N.J.* at 414, 181 *A.*2d 487. The jury's finding that they should respond in punitive damages is fully supported by the evidence.

The punitive damages awarded were not excessive either in relation to the compensatory damages as found by the jury or in relation to the *remittitur* decided upon by us.

The awards are reasonable in relation to the substantial wealth of the defendants, representing, for example, only 2.9% of James' net worth and 2.4% of John's net worth. The awards are also reasonable in relation to the percentages of fault assessed by the jury for compensatory damages, representing, for example, only 6.7 times the compensatory damages for James and John, and far less for the others. The Stavolas point to the recently enacted *Punitive Damages Act, N.J.S.A.* 2A:15–5.9 *et seq.* However, that act, admittedly not applicable since it was adopted after the trial of this case, provides, if anything, support for the Kaplans. It says that punitive damages may no longer exceed "five times the liability of a defendant for compensatory damages or $350,000, whichever is greater." *N.J.S.A.* 2A:15–5.14 b. While the awards slightly exceeded the multiplier as to James and John (though not as to the others), they were less than the upper figure provided by

the act. Under *Herman, supra*, defendants are entitled to a due process review of punitive damage awards for reasonableness, 133 *N.J.* at 338, 627 *A.*2d 1081, but under that broad standard the awards are clearly within reason.

Finally, the Stavola defendants contend that whenever compensatory damages are reduced by way of *remittitur* there must be a new trial with respect to punitive damages. We disagree.

While it is true that punitive damages "'must bear some reasonable relation to the injury inflicted and the cause of the injury,'" *Herman, supra*, 133 *N.J.* at 338, 627 *A.*2d 1081 (citing *Leimgruber v. Claridge Assocs., Ltd.*, 73 *N.J.* 450, 456, 375 *A.*2d 652 (1977)), it does not follow from that proposition that any reduction in compensatory damages by *remittitur* must result in a decrease, proportionate or otherwise, in the punitive damages. In that regard, in *Southwestern Inv. Co. v. Neeley*, 452 *S.W.*2d 705 (Tex.1970), the Supreme Court of Texas, where the law is similar to *Herman* on this point, had this to say:

> We now hold that when a court of civil appeals suggests a remittitur of a substantial portion of the actual damages found by a jury, the court of civil appeals is under an obligation to give consideration to the ratio between exemplary and actual damages as established by the jury in passing on the further question of excessiveness of exemplary damages. Particularly is this true when the jury and trial court have determined actual damages on the premise that the defendant has wrongfully converted all the items in a building and the court of civil appeals has fixed the maximum permissible actual damages on the basis that the defendant has wrongfully converted only some of the items in the building. *Commercial Credit Corp. v. Patterson*, 248 *S.W.*2d 965 (Tex.Civ.App.1952, write ref. n.r.e.).
>
> This is not to say that a court of civil appeals must rigidly adhere to the ratio as found by the fact finder whenever the court of civil appeals suggests a remittitur of some portion of actual damages. We are not to be understood as holding that the ratio between exemplary damages and actual damages found by the jury, to the exclusion of every other consideration, is of controlling importance in estimating the exemplary damages after a remittitur of a portion of actual damages. However-er, in addition to considering the other relevant factors, a court of civil appeals should also take into consideration the ratio between exemplary damages and actual damages as found by the jury, if the court of civil appeals has decided to order a substantial reduction in the actual damages awarded. Thus, although this issue was not faced squarely in *Higginbotham v. O'Keeffe*, 340 *S.W.*2d 350 (Tex.Civ.App.1960, writ ref. n. r.e.), this court found it was not reversible error for

the court of civil appeals there to accept a remittitur of $25,000.00 of the $150,000.00 actual damages awarded while leaving undisturbed the award of $20,000.00 for exemplary damages.

[*Id.* at 708.]

We have not been provided with authority contrary to the approach taken by the Texas Supreme Court. Since the courts of New Jersey have not had an occasion to resolve the issue, and since the Texas solution appears sound, we adopt it.

As *Herman* makes clear, the wealth of the defendant is also a significant and necessary constituent of the appraisal. *Herman, supra,* 133 *N.J.* at 339–42, 627 *A.*2d 1081. We have already noted that the punitive damage award was reasonable in regard to defendants' wealth and reasonable in relation to the compensatory damages as set by the *remittitur*. Therefore, we see no reason for ordering a *remittitur* of the punitive damages, provided the Kaplans accept the *remittitur* offered herein on the compensatory damages.

Affirmed as to liability (except as to Lee Parisi for whom judgment shall be entered); reversed as to damages and a new trial ordered unless the Kaplans consent within thirty days hereof to the *remittitur* of their compensatory damages to $2,229,412.50 plus interest and costs, in which case the punitive damage awards will stand; remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.