DiGIORGIO CORPORATION, Plaintiff,

v.

MENDEZ AND CO., INC.,
Defendant/Counterclaim
Plaintiff,

v.

A. Cordero Badillo, Inc., d/b/a Supermercados Grande Counterclaim/Third Party Defendant.

No. CIV.A. 99–3520.

United States District Court,
D. New Jersey.

Oct. 8, 2002.

Liza M. Walsh, Connell, Foley & Geiser, Roseland, NJ, for Plaintiff.

Christina H. Wang, Porzio, Bromberg & Newman, PC, Morristown, NJ, Jacqueline Greenberg, Duane, Morris, LLP, Newark, NJ, for Defendant/Counterclaim Plaintiff.

## OPINION

WALLS, District Judge.

Plaintiff DiGiorgio Corporation ("DiGiorgio") and third party defendant A. Cordero Badillo, Inc. ("Grande") move for summary judgment on the counterclaims of defendant Mendez and Co., Inc. ("Mendez"). In its counterclaims, Mendez alleges tortious interference by DiGiorgio and Grande with Mendez's alleged relationships with certain grocery suppliers and seeks declaratory judgment that certain contracts between DiGiorgio and Grande are void. Mendez also brings a cross-motion seeking additional discovery. For the reasons below, DiGiorgio's and Grande's motions are granted, and Mendez's cross-motion is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

DiGiorgio, a distributor of grocery products in the United States and Puerto Rico, is located in New Jersey. Grande owns and operates a chain of close to 30 supermarket grocery stores in Puerto Rico. Its stores stock about 30,000 food and other items, most of which Grande purchases from a variety of independent distributors, including Mendez and DiGiorgio. Beginning in December 1998, DiGiorgio has sold grocery store products and other merchandise to Grande. All sales between DiGiorgio and Grande are F.O.B. New Jersey, meaning that title to the goods passes in New Jersey and Grande is responsible for shipping the goods to Puerto Rico.

Mendez, a corporation organized under the laws of Puerto Rico, is a distributor of goods to retail supermarkets located in Puerto Rico. Mendez claims to have contracts with a number of food suppliers under which it serves as the suppliers' exclusive distributor in Puerto Rico. These alleged agreements are discussed at length below.

On May 26, 1999, Mendez wrote a series of letters which give rise to this lawsuit. In a letter to DiGiorgio's Chairman and CEO, Mendez demanded that DiGiorgio "cease and desist" sale to Grande of those goods for which Mendez claimed to be the exclusive distributor in Puerto Rico. Mendez also sent letters to each of ten suppliers with whom Mendez claimed to have exclusive distributor rights. Eight of those ten suppliers are relevant to this lawsuit: Bumble Bee Seafoods, Inc.; Dole Packaged Foods Company; General Mills, Inc.; Unilever de Puerto Rico, Inc.; Fort

James Corporation; Church & Dwight Co., Inc; Riviana Foods, Inc.; and McIlhenny Company (collectively, the "Suppliers"). In each letter, Mendez claimed that Grande and DiGiorgio were involved in a "diversion scheme" that caused Mendez damages, and demanded that the Supplier "honor" its "contractual obligations" to Mendez by taking action to end the alleged diversion scheme.

DiGiorgio learned of Mendez's letters to the Suppliers and filed the complaint in this action, alleging tortious interference with business relations and defamation. DiGiorgio seeks, among other things, declaratory judgment that Mendez has engaged in tortious interference with DiGiorgio's business relationships and an injunction. Mendez moved to dismiss the complaint for lack of personal jurisdiction and/or improper venue, and alternatively to transfer the case to the District of Puerto Rico. The Court denied these motions on April 25, 2000.

Mendez filed an answer and counterclaim against DiGiorgio, naming Grande as a thirdparty defendant. In its counterclaim, Mendez alleges that it is the "exclusive distributor in Puerto Rico" for certain products manufactured by the Suppliers and claims that DiGiorgio and Grande were aware of this fact. In count one of the counterclaim, Mendez asserts a cause of action for tortious interference against DiGiorgio and Grande. In count two of the counterclaim, Mendez seeks a declaratory judgment that the sales contract between DiGiorgio and Grande is for an "illegal purpose" and is null and void.

DiGiorgio and Grande now move for summary judgment on Mendez's counterclaims. Each disputes that Mendez has "exclusive" contracts with the Suppliers and that the contracts, to the extent that they are exclusive, grant Mendez any right to restrict sales outside Puerto Rico.

*The Agreements*

Central to this dispute are the alleged contracts between Mendez and the Suppliers. Mendez claims that the contracts grant it exclusive rights to distribute the Suppliers' products in Puerto Rico. In response to DiGiorgio's interrogatories, Mendez identified the documents on which it bases its assertion of such exclusive rights. Because the contents of these documents are central to DiGiorgio's and Grande's arguments, the Court will discuss each alleged contract individually.

1. Bumble Bee Seafoods, Inc. ("Bumble Bee")

Effective August 23, 1993, Bumble Bee and Mendez entered into a "Distributor Agreement" that provided, "[Bumble Bee] appoints Mendez as [Bumble Bee's] exclusive distributor" for certain products in Puerto Rico. According to Mendez, this contract formalized a distribution arrangement that had been in effect since 1984.

In 1997, Bumble Bee filed a Chapter 11 bankruptcy petition. As a result, Bumble Bee was purchased in 1997 by International Home Foods ("IHP"). Mendez claims that IHP assumed Bumble Bee's contract with Mendez. The only proof offered of the alleged assumption of the contract is a May 5, 1997 letter from Bumble Bee to its distributors announcing its Chapter 11 petition and sale to IHP. The letter stated that IHP "intends to purchase substantially all of Bumble Bee's assets, including the Bumble Bee brand name and the company's tuna production facilities in Puerto Rico, California, and Ecuador." The letter also stated, "The chapter 11 proceedings will have virtually no impact on the operation of the company and we anticipate the sale will be completed within 45 to 60 days. Our daily operations will continue uninterrupted, and we plan to be highly competitive in our markets." Finally, the letter

stated, "[Y]ou will be pleased to know that [IHP] intends to assume ... pre-petition obligations and pay our suppliers in full shortly after the closing of the sale."

Mendez also offers as proof of its alleged exclusive distributorship with Bumble Bee a series of e-mails dated in 2000 in which Mendez purported to inform Bumble Bee of "diversion" of Bumble Bee products into Puerto Rico. Mendez allegedly received commissions for sales it lost because of these diversions. In the e-mails, Rafael Alvarez ("Alvarez"), Vice President of Mendez, refers repeatedly to Puerto Rico as the "exclusive territory" for Mendez's distributorship and to Mendez as Bumble Bee's "exclusive distributors." In its responses to these e-mails, Bumble Bee did not challenge Mendez's characterization of the relationship between the companies.

DiGiorgio asserts that, as of July 1, 1997, Mendez was no longer the distributor of Bumble Bee. It bases its assertion chiefly on a letter dated August 19, 1997, in which bankruptcy counsel for Bumble Bee wrote to Mendez, "[S]ubstantially all of the assets of [Bumble Bee] ... were sold on July 1, 1997. Hence, effective July 1, 1997, *our client was no longer a supplier of Mendez & Co.*" (emphasis added). DiGiorgio also offers a letter dated August 20, 1999, in which IHF informed Mendez that it had decided to appoint another company as the distributor of its products. Mendez argues that the letter was referencing only IHF products, which did not include Bumble Bee products, and that the letter is in fact evidence that Mendez was Bumble Bee's exclusive distributor. The letter reads, in part: "We were very impressed ... with the success you have had distributing Bumble Bee products."

## 2. Dole Packaged Foods, Inc. ("Dole")

Mendez does not claim to have a written contract with Dole. Instead, Mendez claims that Dole verbally appointed Mendez as Dole's exclusive distributor in August 1994. On September 13, 1994, Alvarez wrote Dole a letter which stated in relevant part, "Thank you for your faxes ... regarding the introduction of Dole Packaged Foods into the Puerto Rico market. We are very happy, indeed, that you have chosen Mendez & Co., Inc. as your exclusive distributor and certainly look forward to a successful and profitable future for both our companies." Apart from statements in an affidavit from Alvarez, Mendez offers no evidence that Dole consented to retaining Mendez as its exclusive distributor. Mendez also asserts, again relying on the Alvarez affidavit, that the "course of dealings" between it and Dole since 1994 confirms that Mendez is Dole's exclusive distributor. Mendez offers no evidence of this alleged course of dealings beyond Alvarez's affidavit.

DiGiorgio proffers a different affidavit offered by Alvarez in a related litigation, which states that Mendez is the "sole" distributor in Puerto Rico for Dole. This affidavit does not use the word "exclusive."

## 3. Unilever de Puerto Rico, Inc. ("Unilever")

In a March 10, 1988 letter, Ragu Foods, Inc. wrote to Mendez purporting to memorialize a verbal agreement between the parties, and that Mendez "will be our 'Master Distributor' in Puerto Rico." Mendez would be "entitled to a 3% Master distributor rebate on direct shipments to any other direct buying distributor located in Puerto Rico." Mendez asserts that, "upon information and belief," this letter agreement was later assumed by Unilever, which owned (or came to own) Ragu Foods, Inc. Mendez offers no evidence to prove the assumption of the purported letter agreement. Mendez also points to letters written by Unilever that it claims demonstrate Mendez's exclusive distribu-

torship. One such letter, dated June 4, 1999, was sent to DiGiorgio: Unilever informed DiGiorgio that Unilever had "a distribution agreement with [Mendez] for the distribution of Ragu products ... for quite some time." The letter stated that Unilever had learned of Grande's purchases from DiGiorgio of Ragu products and concluded: "If you are indeed selling to Grande, we have not approved nor do we approve of any distributor other than Mendez selling our Ragu products ... to customers in Puerto Rico."

#### 4. Riviana Foods, Inc. ("Riviana")

Mendez submits an agreement dated August 28, 1984 between it and Riviana which appoints Mendez as Riviana's "exclusive representative" for certain identified packaged rice products "throughout the Commonwealth of Puerto Rico." The agreement further provides that "this Agreement shall not act to inhibit or deny [Riviana's] right in [Riviana's] sole discretion to sell the Products to any other buyer." If Riviana sold to another buyer, however, it was required to inform Mendez in writing within 30 days of such sales and pay Mendez a brokerage fee.

#### 5. Church & Dwight Company, Inc. ("C & D")

C & D sells Arm & Hammer baking soda products. There is no written contract memorializing Mendez and C & D's distributor-seller relationship. Mendez instead relies on a series of documents and correspondence which it claims demonstrate that it is C & D's exclusive distributor. On May 16, 1988, Mendez and Food and Spirits Distributing Corp. of Puerto Rico ("F & S") executed an agreement under which Mendez purported to replace F & S as "the exclusive distributor in Puerto Rico of Kikkoman, Tabasco and Arm & Hammer products." Mendez and C & D never executed a formal agreement after that purported assignment. Mendez

points to the following documents as further proof of its exclusive distributorship: a 1992 draft distribution agreement sent to Mendez from C & D, which was never executed; handwritten notes allegedly written by someone at Mendez which made reference to the fact that a company, which Mendez asserts is C & D, was willing to confirm Mendez as "their distributor"; and a March 24, 1999 letter from its counsel to C & D which stated that "Mendez would like to retain the distribution of your baking soda" and requesting "your reconfirmation of its exclusive distribution rights for the territory of Puerto Rico."

DiGiorgio points to several documents which it claims call into question Mendez's alleged rights as C & D's distributor. On February 17, 1999, C & D sent a letter to Mendez which expressed its dissatisfaction with "our level of Arm & Hammer business in Puerto Rico" and said, "To continue doing business at the present level does not make sense for [C & D] nor can it make sense for Mendez.... As such, I propose that we terminate the relationship." On September 9, 1999, C & D wrote to Mendez: "I have not made much progress in locating another distributor. I would like to appoint another distributor prior to the transfer of goods so I can avoid shipping the goods to the main land and back to Puerto Rico. As such I would appreciate your patience in this matter."

Mendez claims that these statements by C & D applied only to the distribution of Arm & Hammer personal care and household products, and did not apply to Mendez's distribution of Arm & Hammer baking soda. The distribution of Arm & Hammer baking soda, Mendez claims, was and remains an exclusive relationship.

#### 6. McIlhenny Company ("McIlhenny")

Mendez relies on a letter from McIlhenny to Mendez dated May 29, 1991, which

stated, "[McIlhenny] recognizes [Mendez] as the exclusive distributor of Tabasco brand products in Puerto Rico" and adds that McIlhenny will "no longer sell directly to any third party" in Puerto Rico.

### 7. Fort James Corporation ("Fort James")

Mendez points to a series of documents which it claims collectively establish its exclusive distributorship with Fort James. The first is a letter dated February 5, 1994, from an entity called James River Corporation which stated, "This letter is to confirm that we are pleased to hereby appoint [Mendez] as our exclusive distributor for Dixie retail products in Puerto Rico." Mendez also points to a "Distribution Agreement" between itself and the Fort Howard Corporation, dated September 30, 1994, which provided, "Fort Howard hereby appoints Mendez as its distributor of the Products within [Puerto Rico].... Fort Howard agrees that during the term of this Agreement ... Fort Howard will not appoint any other person or entity to act as a Fort Howard Consumer Products Division distributor of the Products within [Puerto Rico]." Mendez asserts, "upon information and belief," that James River Corporation and Fort Howard Corporation merged in 1997. Mendez has produced a press release dated August 13, 1997, announcing the merger. Mendez also asserts that the newly formed entity, the Fort James Corporation, "assumed the existing exclusive agreements and continues to operate its exclusive distributorship agreement with Mendez under the same terms and conditions as the original ... agreements." Mendez offers no evidence of this purported assumption of the James River and Fort Howard contracts.

### 8. General Mills, Inc. ("General Mills")

An agreement dated March 1, 1984 and entitled "Sales Agreement" provided that Mendez "shall have the exclusive sale in Puerto Rico of Betty Crocker Mixes, General Mills' cereals and snacks and Gold Metal Kitchen–Tested Flour in consumer size packages." In further support of its alleged exclusive rights, Mendez relies on a letter dated June 8, 1999, from General Mills to White Rose Food of Carteret, New Jersey, in which General Mills wrote that it "has had an exclusive distribution agreement with [Mendez] whereby [Mendez] ... is the only entity authorized to distribute our products in Puerto Rico." The letter also said, "We do not approve of ... any distributor, other than Mendez, selling our products to customers in Puerto Rico and we are asking that you stop selling our products in Puerto Rico, if in fact, you are doing so."

## *DISCUSSION*

### I. Choice of Law

As a preliminary manner the Court must determine what law to apply to DiGiorgio's and Grande's motions for summary judgment. In their briefs, both DiGiorgio and Grande assert that New Jersey law should govern their motions. Mendez argues that Puerto Rico law should apply.

### A. Standard

A federal court with diversity jurisdiction must apply the choice of law principles of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). New Jersey employs a government-interest analysis in choice-of-law decisions. *Veazey v. Doremus*, 103 N.J. 244, 247, 510 A.2d 1187, 1189 (1986). Under that analysis, the determinative law is that of the state with the greatest interest in governing the particular issue. *Id.*, 103 N.J. at 248, 510 A.2d 1187. The first step of the analysis is to determine, on an issue-by-issue basis, whether a conflict exists

between the law of the interested states. *Id.* The second step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties. *Id.* If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. *Id.*

New Jersey courts have looked to the Restatement (Second) of Conflict of Laws to guide its application of the government-interest test in tort cases. *Erny v. Estate of Merola,* 171 N.J. 86, 101, 792 A.2d 1208, 1217 (2002), *citing Fu v. Fu,* 160 N.J. 108, 122, 733 A.2d 1133 (1999). The factors which the courts have identified from the Restatement are: (1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states. *Id.* The most important of these factors is the competing interests of the states. *Id.* In addition, the courts have specified the state contacts that are most germane to the analysis: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered. *Id* at 102–103, 792 A.2d 1208.

B.  Application

■  With this standard in mind, the Court must decide whether to apply New Jersey or Puerto Rico tortious interference law to this dispute. The first step is to determine whether there is a conflict.

New Jersey has adopted the Restatement (Second) of Torts definition of tortious interference with an existing contract. To establish this tort, a plaintiff

must prove: (1) an existing contractual relationship; (2) intentional and malicious interference with that relationship; (3) loss or breach of a contract as a result of the interference; and (4) damages resulting from that interference. *Printing Mart–Morristown v. Sharp Elec. Corp.,* 116 N.J. 739, 751–52, 563 A.2d 31 (1989).

The four elements of tortious interference with a contractual relationship under Puerto Rico law were established by the Supreme Court of Puerto Rico. *See Caribe Indus. Sys., Inc. v. Nat'l Starch & Chem. Co., et al.,* 36 F.Supp.2d 448, 451 (D.P.R. 1999), *citing Gen. Office Prods. v. A.M. Capen's Sons, Inc.,* 115 D.P.R. 553 (1984). First, there must be a contract with which a third person interferes. *Id.* Second, the defendant must have acted intentionally and with knowledge of the contract's existence. *Id.* "Fault must be present." *Gen. Office Prods. v. A.M. Capen's Sons, Inc.,* 780 F.2d 1077, 1079 (1st Cir.1986). Third, there must be damage to the plaintiff. *Caribe,* 36 F.Supp.2d at 451. Fourth, that damage must be the result of the tortious acts of the defendant. *Id.*

Mendez argues that the law of Puerto Rico is in conflict with New Jersey law because it does not require "malice." Instead, it requires "fault," which Mendez argues can be proved by evidence allowing an inference that the defendant merely acted with knowledge of the contract's existence. According to Mendez, the "fault" requirement is akin to the requirement under New Jersey law that the interference with the existing contract be "intentional." Based on this, Mendez concludes that Puerto Rico law does not require a showing of "malice," which New Jersey law does.

DiGiorgio and Grande argue that cases decided after the Puerto Rico Supreme Court's decision demonstrate that "fault" is akin to "malice." In *General Office*

*Prods. Corp. v. A.M. Capen's Sons, Inc.,* 607 F.Supp. 1191, 1194 (D.P.R.1985), *rev'd* 780 F.2d 1077 (1st Cir.1986) (finding summary judgment inappropriate where questions of fact existed as to defendant's knowledge of plaintiff's contracts), the Federal District Court for the District of Puerto Rico found that "fault" cannot be equated to negligence. Instead, the Court observed, fault "encompasses more and the evidence to prove it needs to be stronger and different from that of negligence. Indeed, fault is more akin to dolus ... Dolus means malice, bad intention, in addition to mere voluntariness." *Id.* The District Court further held that "fault cannot be established without knowledge." *Id.* Based on these holdings, DiGiorgio argues that the "fault" element of tortious interference under Puerto Rico law is analogous to the "malice" requirement of New Jersey law.

This Court finds that the better reading of the case law lies with DiGiorgio and Grande. Under New Jersey law, as explained more fully below, "malice" does not necessarily require "ill will," but rather means that the harm was inflicted by the defendant without justification or excuse. *Printing Mart–Morristown v. Sharp Elec. Corp.,* 116 N.J. 739, 751, 563 A.2d 31, 37 (1989). Like "fault" or "dolus" under Puerto Rico law, "malice" implies conduct more egregious and blameworthy than mere negligence. Under both New Jersey and Puerto Rico law, to be liable a defendant must not only fail to act with a reasonable standard of care, but must also act with knowledge that the alleged injury will result and without justification or excuse. Whether called "malice" or "fault," the requirements are substantively indistinguishable. Therefore, the Court finds that there is no conflict between New Jersey and Puerto Rico tortious interference law, and that New Jersey law should apply under the government interest test.

Even if the Court found that a conflict existed, however, it would hold that New Jersey law applies to Mendez's tortious interference counterclaims because New Jersey has the greater interest in deciding the issue. The most significant factor in applying New Jersey law is that the conduct giving rise to the alleged injury— namely, the transactions between DiGiorgio and Grande—took place in New Jersey. New Jersey has a strong interest in having its law apply to corporations located in New Jersey and doing business in New Jersey. If New Jersey law did not apply to situations such as the dispute at bar, then parties transacting business in New Jersey would subject themselves to the law of all 50 states (plus the U.S. territories) on tortious interference depending on the location of potential future plaintiffs. Such lack of predictability of potential future liability would be a serious hindrance to transacting business in New Jersey.

Mendez argues that Puerto Rico has a strong interest in applying its law to this dispute. The alleged contacts between Mendez and the Suppliers were entered into in Puerto Rico, and Mendez's alleged injury arising from DiGiorgio and Grande's conduct occurred in Puerto Rico. Puerto Rico, Mendez argues, has an interest both in giving force to contracts entered into by its citizens within its borders and in protecting its citizens from conduct by third parties that infringes on a citizen's contractual rights. These interests, however, are not related to the tortious interference counterclaim. Rather, they indicate that, to the extent there is a conflict between New Jersey and Puerto Rico law on contract interpretation and construction, Puerto Rico law should apply to the interpretation and construction of the contracts between Mendez and the Suppliers. In so doing, the Court would give force to Mendez's reasonable expectation that the con-

tracts it entered into in Puerto Rico would be interpreted under Puerto Rico law.[1] The tortious interference counterclaim, however, is separate from issues of the interpretation of the Mendez–Supplier contracts. On the counterclaims, the most compelling interest is DiGiorgio's and Grande's expectation of their potential future liability arising from their business transactions. Put another way, if Puerto Rico law applied to the counterclaims, then merely by entering into a contract in Puerto Rico, Mendez could force all other persons throughout the United States to comply with Puerto Rico tortious interference law whenever they entered into a transaction that might impact Mendez's contractual rights. Such nationwide application of one state's or territory's laws cannot be justified under the government interest analysis.

New Jersey law will apply to the counterclaims.

## II. Summary Judgment

Having determined that New Jersey law applies to DiGiorgio's and Grande's summary judgment motions, the Court will now address the motions on their merits. Because the arguments advanced in favor of and in opposition to each motion are very similar, the Court will discuss the motions together.

## A. Standard

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting Fed.

R.Civ.P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists only if the evidence presented would enable a reasonable jury to return a verdict for the nonmovant. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment must be granted if no reasonable trier of fact could find for the non-moving party. *See id.* at 249, 106 S.Ct. 2505.

The non-moving party may not defeat summary judgment by simply resting on the argument that the record contains facts sufficient to support his claims. *See Big Apple BMW, Inc. v. BMW of North America, Inc.,* 974 F.2d 1358, 1362 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993); *O'Donnell v. U.S.,* 891 F.2d 1079, 1082 (3d Cir.1989). Rather, the non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; Fed.R.Civ.P. 56(e). Such affidavits must be based "on personal knowledge," establish "such facts which would be admissible," and "show affirmatively that the affiant is competent to testify in all matters stated therein." *Maldonado v. Ramirez,* 757 F.2d 48, 50 (3d Cir.1985); *see also* 6 J. Moore, W. Taggert & J. Wicker *Moore's Federal Practice*

---

**1.** The parties have not presented, nor Court is not aware of, any conflict between the laws of New Jersey and Puerto Rico law regarding

the basic elements of contract interpretation, however.

§ 56.22[1] (2d ed.1985). "[C]onclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment." *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972); *see also First Nat'l Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 288–290, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Gostin v. Nelson*, 363 F.2d 371 (3d Cir.1966).

## B. Elements of Tortious Interference

DiGiorgio and Grande each argue that, as a matter of law, Mendez cannot prove three of the four elements of its tortious interference counterclaims. First, they argue that Mendez cannot show an existing contractual relationship that would be implicated by the sale of grocery products in New Jersey between DiGiorgio and Grande. Second, they argue that there can be no showing of any intentional or malicious interference by them with any contract that might exist. Finally, they argue that Mendez cannot assert a breach caused by any alleged interference.

The Court finds that questions of fact exist as to the existence and scope of the contractual relationship between Mendez and most of the Suppliers. The Court also finds, however, that even if an "exclusive distributor" contract exists between Mendez and each of the Suppliers, Mendez cannot show that either DiGiorgio or Grande intentionally or maliciously interfered with such contracts. Moreover, even if such interference could be proved, it did not cause any breach of any contract, and therefore did not result in any injury to Mendez. It follows then that, as a matter of law, Mendez cannot prevail on its tortious interference counterclaim. Summary judgment will be granted in favor of DiGiorgio and Mendez.

## 1. Existing contractual relationship

For Mendez to prevail on its counterclaim, it must first show that a contractual relationship existed among it and the Suppliers under which Mendez was granted rights as the Suppliers' exclusive distributor in Puerto Rico. DiGiorgio and Grande argue that, as a matter of law, Mendez cannot demonstrate this element because none of the contracts would implicate sales transactions occurring outside Puerto Rico. That argument, however, is really directed at the second and third elements of a tortious interference claim: whether the transactions between DiGiorgio and Grande interfered with whatever contractual rights Mendez might possess and caused a breach of contract. The initial inquiry for the Court is whether Mendez can prove the existence of a contract with any of the Suppliers under which the Suppliers granted it rights as exclusive distributor in Puerto Rico.

Where the terms of a contract are unambiguous, their literal meaning must be applied and their construction is a question of law appropriate for summary judgment. *W.B. v. Matula*, 67 F.3d 484, 497 (3d Cir. 1995) (citations omitted); *Innovation Marketing v. Tuffcare, Inc.*, 31 F.Supp.2d 218, 222 (D.P.R.1998). Where a contract is ambiguous, the intent of the parties is a question of fact for the jury. *Sumitomo Mach. Corp. of America v. AlliedSignal, Inc.*, 81 F.3d 328, 335 (3d Cir.1996); *In re Newport Plaza Assocs.*, 985 F.2d 640, 644 (1st Cir.1993). Contract interpretation often presents mixed questions of law and fact. *Servicios Comerciales Andinos, S.A. v. General Elec. Del Caribe, Inc.*, 145 F.3d 463, 469 (1st Cir.1998). A dispute about the factual narrative giving rise to the alleged contract is a question of fact, and therefore should be decided by the jury. *Ram Const. Co. v. American States Ins. Co.*, 749 F.2d 1049, 1052 (3d Cir.1984).

Here, Mendez claims that it was exclusive distributor for each Supplier in Puerto Rico. In several of the cases, DiGiorgio and Grande dispute whether such a contract with such a right exists. The Court will examine each alleged contract.

a. Bumble Bee

Bumble Bee and Mendez entered into an agreement naming Mendez as Bumble Bee's exclusive distributor in Puerto Rico in 1993. Bumble Bee was purchased in 1997 by IHP. Mendez claims that IHP assumed Bumble Bee's contractual obligations and offers several pieces of correspondence purporting to show that the distributorship continues to exist. DiGiorgio and Grande dispute Mendez's assertion, attacking Mendez's interpretation of the evidence and pointing to several other pieces of correspondence that they claim indicate that IHP, rather than assuming the Bumble Bee–Mendez contract, terminated the distributorship sometime after acquiring Bumble Bee.

The Court may not and will not attempt to weigh the credibility of the evidence offered by the parties. Mendez has offered sufficient evidence to create a question of fact as to whether IHP assumed its contract with Bumble Bee and therefore whether it continued to be the exclusive distributor of Bumble Bee's products in Puerto Rico. Although Mendez has not shown as a matter of law that such a relationship exists, the burden at this stage is on DiGiorgio and Mendez to prove as a matter of law that such a contract does not exist. The evidence they offer is insufficient. For example, the August 19, 1997 letter from Bumble Bee's bankruptcy counsel merely states that Bumble Bee ceased to be a distributor of Mendez after it sold its assets to IHP; it does not prove that IHP did not assume the obligations of the preexisting agreement. The Court finds that a question of fact exists as to whether Mendez was Bumble Bee's exclusive distributor in Puerto Rico.

b. Dole

A question of fact also exists as to whether Mendez is Dole's exclusive distributor in Puerto Rico. Mendez offers the sworn statement of its Vice President that such an agreement was entered into in August 1994 and that the parties have engaged in such a course of conduct since that time. Mendez also offers a letter written by Mendez thanking Dole for naming Mendez its exclusive distributor. DiGiorgio and Mendez point to an affidavit in another litigation in which Mendez describes the relationship using the synonym "sole" in place of "exclusive." DiGiorgio and Grande have not demonstrated enough evidence to show that a reasonable jury could not find that there is a contract between Mendez and Dole naming Mendez as Dole's exclusive distributor in Puerto Rico.

c. Unilever

Mendez premises its contractual relationship with Unilever on a March 10, 1988 letter from Unilever naming Mendez as its " 'Master Distributor' in Puerto Rico." The letter provides that Mendez is entitled to rebates for any shipments made to any other distributor. In addition, Mendez provides a copy of a letter dated June 4, 1999 from Unilever to DiGiorgio in which Unilever states, "[W]e have not approved nor do we approve of any distributor other than Mendez selling our ... products ... to customers in Puerto Rico." This evidence is not rebutted by either DiGiorgio or Grande. Clearly, neither DiGiorgio nor Grande is entitled to summary judgment on the basis of this element of the counterclaim.

#### d. Riviana

Mendez and Riviana entered into an agreement in 1984 that provided, among other things, that Riviana "appoints [Mendez] its exclusive representative" for certain specified rice products. As DiGiorgio and Grande point out, the agreement reserves Riviana's right to sell its products "to any buyer." If Riviana sold to another buyer, however, it had to pay Mendez a brokerage fee as if Mendez was the distributor on those sales. Certainly, DiGiorgio and Grande cannot rely on this clause as their sole proof that, as a matter of law, Mendez was not Riviana's exclusive distributor in Puerto Rico. If anything, the contract is best interpreted as making Mendez the exclusive distributor and providing for specified relief in the event that Riviana used another distributor. DiGiorgio and Grande are not entitled to summary judgment on this element of the counterclaim.

#### e. C & D

Mendez relies on a series of documents and letters to establish its purported contract with C & D. DiGiorgio and Mendez call into question the validity of these documents. As in the case of the alleged Bumble Bee contract, however, it is not the Court's role to determine which party's version of the narrative facts is more credible. That is a question of fact. Construing the facts and inferences in a light most favorable to Mendez, the Court cannot say that a reasonable jury could not find that Mendez and C & D had a contractual relationship under which Mendez served as C & D's exclusive distributor in Puerto Rico.

#### f. McIlhenny

In a 1991 letter to Mendez, McIlhenny stated that it "recognizes [Mendez] as the exclusive distributor of Tabasco brand products in Puerto Rico and will no longer sell directly to any third party." DiGior-gio and Grande offer no evidence refuting that Mendez and McIlhenny did not have an agreement under which Mendez served as McIlhenny's exclusive distributor in Puerto Rico but instead argue that such authority did not extend outside Puerto Rico. Again, this argument goes to whether DiGiorgio and Grande maliciously interfered with Mendez's contracts and whether such interference resulted in a breach, not whether such contracts exist. The Court thus finds that DiGiorgio and Grande are not entitled to summary judgment based on this element of the counterclaim with regard to this Supplier.

#### g. Fort James

Mendez's assertion of a contract right with Fort James is convoluted. It has produced written agreements between it and two entities—James River Corporation and Fort Howard Corporation—that reference an exclusive distribution arrangement in Puerto Rico. It also asserts that James River Corporation and Fort Howard Corporation merged to become Fort James, and that Fort James assumed the obligation of the contracts of its two predecessors. Mendez has not provided any evidence upon which a jury could rule in its favor on this issue, however, and relies on its mere assertions. Mere assertions alone, however, are not sufficient to defeat summary judgment; the non-movant must produce evidence indicating a triable issue of fact. Mendez has not provided evidence to defeat summary judgment with regard to the purported contract with this Supplier. The Court therefore rules that, as a matter of law, Mendez was not Fort James' exclusive distributor in Puerto Rico, and grants summary judgment to DiGiorgio and Grande on the counterclaims in reference to this alleged contract.

h. General Mills

On March 1, 1984, Mendez and General Mills entered into a sales agreement which provided that Mendez "shall have the exclusive sale in Puerto Rico of" certain specified General Mills products. DiGiorgio and Grande do not dispute the validity of this document, but argue that it does not impact any transactions that took place in New Jersey. As the Court has noted, this argument is applicable to the second and third elements of the counter claim—intentional and malicious interference resulting in a breach—not to whether a contract existed. The Court finds that DiGiorgio and Grande are not entitled to summary judgment based on this element of the counterclaim with regard to this Supplier.

To summarize, in the case of seven of the eight Suppliers, the Court finds that a question of fact exists as to whether Mendez had a contractual right as their "exclusive distributor" in Puerto Rico. Only in the case of the Fort James Corporation does the Court find that, as a matter of law, Mendez cannot prove the first element of its tortious interference counterclaim. Therefore, the Court will grant DiGiorgio's and Grande's motions for summary judgment based on this first element only for the alleged contract between Mendez and Fort James. As to the agreements with the rest of the Suppliers, the Court will examine the remaining elements of the counterclaim.

2. Intentional and Malicious Interference

The second element Mendez must prove to prevail on its counterclaim is intentional and malicious interference by DiGorgio and Grande with the contract between Mendez and the Suppliers. For the reasons identified below, the Court finds that because Mendez, as a matter of law, cannot show such intentional and malicious interference, DiGiorgio and Grande are entitled to summary judgment.

In order to show intentional interference, a plaintiff must demonstrate that the defendant acted with either an intent to interfere with plaintiff's contract right or acted with knowledge that his actions would interfere with the contract right. *Velop, Inc. v. Kaplan,* 301 N.J.Super. 32, 49, 693 A.2d 917, 926 (N.J.Super.Ct.App.Div.1997). New Jersey courts, having adopted a variation of the elements of tortious interference from the Restatement, frequently look to the Restatement for guidance. The comment to the relevant section of the Restatement says: "The rule stated in this Section is applicable if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose.... It applies also to intentional interference ... in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action." *Restatement (Second) of Torts, § 766,* comment j (1979). As a threshold matter, therefore, a plaintiff must show that defendant had knowledge of the existing contract. General knowledge of a business relationship is not sufficient; the defendant must have specific knowledge of the contract right upon which his actions infringe. *See, e.g., Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.,* 870 F.Supp. 1237, 1247 (D.N.J.1994) (defendant's alleged knowledge of general distribution scheme of plaintiff's hair care products not enough to establish intentional interference).

■ Moreover, a plaintiff must also prove that the intentional interference was done with malice. As noted earlier, "malice" in this context does not require ill will,

but rather means that the harm was inflicted without justification or excuse. *Printing Mart–Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 751, 563 A.2d 31, 37 (1989). The inquiry as to whether a defendant's actions were improper is guided by reference to the Restatement, which offers the following factors as relevant: (i) the nature of the actor's conduct; (ii) the actor's motive; (iii) the interests of the party with which the actor's conduct interferes; (iv) the interests sought to be advanced by the actor; (v) the social interests in protecting the freedom of action of the actor and the commercial interests of the other party; (vi) the proximity or remoteness of the actor's conduct to the interference; and (vii) the relations between the parties. *Restatement (Second) of Torts*, § 767 (1979). The standard is flexible, however, and must be determined on a case-by-case basis. *Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 306, 770 A.2d 1158, 1170 (2001) (citations omitted). "Often it is stated that the relevant inquiry is whether the conduct was sanctioned by the 'rules of the game,' for where a plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury." *Id.* New Jersey courts have long understood the inquiry to focus on whether defendant's actions amounted to "sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated," *Harris v. Perl*, 41 N.J. 455, 461, 197 A.2d 359, 363 (1964), or alternatively were "a violation of standards of socially acceptable conduct." *Baldasarre v. Butler*, 254 N.J.Super. 502, 526, 604 A.2d 112, 124 (N.J.Super.Ct.App.Div.1992), *aff'd in relevant part, rev'd in part*, 132 N.J. 278, 625 A.2d 458 (1993) (internal quotations omitted).

■ Even if Mendez could prove that DiGiorgio and Grande had sufficient knowledge of the alleged contracts to make their conduct intentional, it cannot as a matter of law prove malice. The only conduct in which DiGiorgio and Grande were allegedly engaged was sales of grocery items in New Jersey, which Grande then shipped to Puerto Rico. In doing so, neither DiGiorgio or Grande violated any agreement they had with Mendez or the Suppliers. Grande has no agreement with Mendez obligating it to purchase its groceries from Mendez. There are no allegations of physical violence, misrepresentations, abuse of legal process, unlawful conduct, or unwarranted economic pressure—the types of conduct identified by the Restatement as likely to give rise to a finding of impropriety—on the part of either DiGiorgio or Grande. *See Restatement (Second) of Torts*, § 767 (1977). Nor is there evidence that either DiGiorgio or Grande was motivated by any improper motive or desire to harm Mendez. Rather, the evidence indicates that the two parties were motivated entirely by potential profits, a legitimate and indeed encouraged motivation. Furthermore, there is no particular societal interest in protecting the distribution scheme of the Suppliers and Mendez through a tortious interference claim against Mendez's competitors, as Mendez has an alternative means of protecting its alleged contract rights—suit against the Suppliers for breach of the alleged agreements. *See Matrix*, 870 F.Supp. at 1249 (noting that manufacturer could attempt to enforce its contract against distributors allegedly engaged in diversion of products to unlicensed retailers).

In short, there is no basis on which any finding could be made that either DiGiorgio or Grande was motivated by an improper purpose or pursued improper means. Grande apparently believed it could receive a better price for the goods it sought by purchasing them from DiGiorgio in New Jersey and paying to have them shipped to Puerto Rico instead of purchasing them directly from Mendez in Puerto

Rico. The resulting transactions fall well within the "rules of the game" and offend no business practice or ethic. To the contrary, they amount to nothing more than open, free-market competition, and as noted above cannot give rise to liability.

### 3. Interference Resulting in a Breach or Loss of Contract

■ Moreover, one interferes with a contract only where he causes a party not to perform under it. As noted, a plaintiff must show that the defendant's intentional and malicious interference resulted in a breach or loss of the contract. *Velop*, 693 A.2d at 926, 301 N.J.Super. 32, *citing Printing Mart*, 116 N.J. at 751, 563 A.2d 31. The Restatement definition of the tort makes this clear: "One who intentionally and improperly interferes with the performance of a contract ... between another and a third person *by inducing or otherwise causing the third person not to perform the contract*, is subject to liability to the other for pecuniary loss resulting to the other from failure of the third person to perform the contract." *Restatement (Second) of Torts*, § 766 (1979) (emphasis added). If the contract is performed despite the actions of the defendant, then those actions do not amount tortious interference with contract. The cause of action requires a failure to perform.

Here DiGiorgio and Grande argue that their transactions, which took place in New Jersey, did not cause any breach of any contract. They claim that the contracts between Mendez and the Suppliers, to the extent they exist, provide Mendez only with the right to be the Suppliers' exclusive distributor within Puerto Rico, and that sales in New Jersey do not impact that right even if the products exchanged eventually find their way to Puerto Rico for resale. Put another way, DiGiorgio and Grande argue that, so long as no other party is distributing the goods in question within the physical boundaries of Puerto

Rico, Mednez's rights as exclusive distributor in Puerto Rico are unaffected and intact.

The issue, therefore, is what it means to be an "exclusive distributor" in Puerto Rico: does it entail having exclusive control over the distribution of productions within Puerto Rico itself, or does it include the right to prevent others from distributing elsewhere products that eventually are marketed for sale in Puerto Rico? For guidance, the Court looks to Puerto Rico's "Law 75." 10 L.P.R.A. § 278(a). Law 75 was passed by the Puerto Rico legislature to govern exclusive distributorships with the purpose of protecting the interests of distributors in Puerto Rico. *A.M. Capen's Co. v. American Trading*, 202 F.3d 469, 474 (1st Cir.2000). The law was passed to address the Legislature's finding that the legal principles traditionally applicable to supplierdistributor relationships were not adequately protecting the distributors against arbitrary decision made by suppliers. *R.W. Int'l Corp. v. Welch Foods, Inc.*, 88 F.3d 49, 51 (1st Cir.1996).

In a parallel litigation to this case, the Court of First Instance in Puerto Rico was asked to determine whether the transactions in New Jersey between DiGiorgio and Grande violated Mendez's rights under Law 75 as an exclusive distributor in Puerto Rico. The Court held that they did not. The Court said that Law 75 does not prohibit "a third party strange[r] to the relationship between the [supplier] and the distributor [from purchasing] outside Puerto Rico products that are the object of an exclusive distribution contract with the purpose of reselling them in Puerto Rico." On reconsideration, the Court reiterated that Law 75 "does not prohibit a third party unrelated to an exclusive distribution contract to go outside of Puerto Rico to purchase those products which are covered

by the exclusive distribution contract to resell them in Puerto Rico."

These decisions make clear that, under the law protecting Mendez as an exclusive distributor, Mendez's rights were not violated by the transactions between DiGiorgio and Grande, which took place in New Jersey. In other words, the contracts between Mendez and the Suppliers were not breached because, under Puerto Rico law, an exclusive distributor does not have the right to enjoin transactions that take place outside Puerto Rico, even if the products are exchanged for ultimate resale in Puerto Rico. The conduct of DiGiorgio and Mendez under the circumstances of this case cannot be said to be an interference with Mendez's contractual rights.

The Court is aware that the Court of First Instance in Puerto Rico specifically stated that, in making its ruling regarding the scope of Law 75, it did not intent to dispose of any tortious interference claim. The dismissal of the tortious interference claim, however, is the inescapable result of the Court of First Instance's decision. The Court of First Instance limited Mendez's rights as the Suppliers' exclusive distributor by prohibiting it from taking action against the DiGiorgio Grande transactions. Because those transactions do not affect Mendez's contractual rights, they cannot give rise to a cause of action for tortious interference with contract. DiGiorgio and Mendez are each entitled to summary judgment on this basis.

In sum, the Court finds that, as a matter of law, Mendez has not offered any evidence to demonstrate that either DiGiorgio or Grande maliciously and intentionally interfered with its contracts. And, even if Mendez had made such a showing, Mendez cannot as a matter of law show that such interference resulted in a breach of those contracts. For these reasons, summary judgment is granted for DiGiorgio and Grande on Mendez's tortious interference

counterclaim. Moreover, because Mendez's counterclaim for declaratory judgment is entirely derivative of its tortious interference counterclaim, it also cannot stand. Summary judgment also will be granted for DiGiorgio and Grande on the declaratory judgment counterclaim.

III. Discovery

Mendez cross-moves for futher discovery that it claims is required before the summary judgment motion may be decided. Such request is denied. None of the lines of inquiry proposed by Mendez could produce facts that would reveal a contract right on Mendez's behalf that would be infringed by the DiGiorgio–Grande transactions. Even if additional discovery would solidify Mendez's position that it had "exclusive distributor" rights in Puerto Rico, such a showing would have no bearing on the Court's finding that DiGiorgio and Grande did not maliciously interfere with Mendez's rights. Nor is there even an allegation of improper conduct by DiGiorgio or Grande. The only further evidence sought by Mendez related to DiGiorgio's "plans" to sell products to grocers located in Puerto Rico. Such plans, even if discovered, could not amount to malice.

### *Conclusion*

For the reasons stated, DiGiorgio's and Grande's motions for summary judgment are granted. Mendez's cross-motion for additional discovery is denied.

### **ORDER**

Plaintiff DiGiorgio Corporation ("DiGiorgio") and Third Party Defendant A. Cordero Badillo, Inc., d/b/a Supermercados Grande ("Grande") have each filed motions for summary judgment on the counterclaims asserted by Defendant Mendez and Company, Inc. ("Mendez").

568

The Court has considered the motions and the evidentiary submissions from all the parties and concluded that, as a matter of law, Mendez cannot prevail on its counterclaims.

It is on this __ day of October, 2002:

ORDERED that DiGiorgio's motion for summary judgment on Mendez's counterclaims is GRANTED; and

ORDERED that Grande's motion for summary judgment on Mendez's counterclaims is GRANTED.