**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4950-17T2

SAMUEL J. MEDWAY,

     Plaintiff-Respondent,

v.

ENCOMPASS INSURANCE
COMPANY,

     Defendant-Appellant.

_____

Submitted March 28, 2019 – Decided April 24, 2019

Before Judges Simonelli and Firko.

On appeal from Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-0307-16.

Hardin, Kundla, McKeon & Poletto, PA, attorneys for appellant (Todd C. Landis, of counsel and on the briefs).

Vincent R. Glorisi, attorney for respondent.

PER CURIAM

Defendant Encompass Insurance Company (Encompass) appeals from the trial court's granting of plaintiff Samuel J. Medway's motion for a new trial on the issue of damages only following a jury verdict in this uninsured motorist personal injury matter. The first jury determined that the phantom driver was 100% negligent and awarded plaintiff compensatory damages in the amount of $25,000. On retrial on the issue of damages only, the subsequent jury awarded plaintiff compensatory damages in the amount of $350,000. We affirm both the order granting plaintiff's motion for a new trial on damages only and the $350,000 jury verdict.

I.

These are the relevant facts adduced at trial. At approximately 1:00 a.m. on June 2, 2010, plaintiff, age forty-two at the time, was traveling southbound on the Garden State Parkway (GSP) in Galloway Township, a two-lane road. According to plaintiff, a phantom vehicle was tailgating his vehicle and drove up the left lane "extremely fast[,]" cutting him off, and hitting the front right-hand side of his vehicle, causing him to "slam" on his brakes. Both vehicles began to swerve and plaintiff's vehicle collided with the barrier on the right side of the roadway. His vehicle "immediately deflected over to the left-hand side[,]"

A-4950-17T2

and crashed into the left guardrail. Plaintiff estimated that he was traveling forty to fifty miles per hour at the time of the impact. He was wearing his seatbelt and his airbags deployed as a result of the accident, causing him to be "thrown" into his seatbelt and into the driver's side door. It was "a beautiful summer night[,] [w]arm, [and] bright" as per plaintiff's testimony.

Plaintiff called for emergency assistance, exited his vehicle and stood behind the guardrail to protect himself while awaiting assistance because his vehicle landed perpendicular on the GSP. His "adrenaline was going so horribly" that he did not appreciate his injuries. He tried to get flares out of the trunk of his vehicle but it was "smushed in because the car had such a heavy impact it was like an accordion." A woman began running towards plaintiff's vehicle yelling, "I'm sorry. I cut you off. Do you want me to call the police[?]" He replied that he already called and asked her if she had flares to set up on the roadway. Plaintiff testified that she returned to her older, four-door, white Toyota Corolla, and drove away. Because he was in "a daze," he did not obtain or record any information from her.

Another party, Danielle Kurtz, was involved in the accident and was referred to as the "rear-end" driver at trial. She did not testify and was never deposed. At the accident scene, Kurtz gave a statement to the investigating

A-4950-17T2

officer, Sergeant Scott Frankas, that plaintiff was speeding in the left lane and "crossed into the path of the rear hit driver." The trial judge ruled that Kurtz's statement constituted inadmissible hearsay and Frankas was not allowed to "formulate any opinion or describe to the jury what [Kurtz] had told him." Frankas's testimony was limited to his observations of damage to plaintiff and Kurtz's vehicles and communications he had with plaintiff. According to Frankas, he was a state trooper at the time of the accident and was promoted to sergeant afterwards. He testified about damage he observed to the passenger side rear and front portion of plaintiff's vehicle and damage to the front side of Kurtz's vehicle, as well as the guardrails. He also noted there were skid marks, or "yaw marks," in the left lane, southwest direction, and he concluded the damage to Kurtz's vehicle was "consistent to that of a sideswipe accident." Plaintiff could not recall whether he struck another vehicle, including the phantom vehicle, according to Frankas's testimony.

Plaintiff was transported to AtlantiCare Regional Medical Center where he complained of facial, nasal, neck, shoulder, and left side pain, as well as loose teeth. He testified that his face and nose were "totally bashed in" and there was "blood everywhere." A CT[1] scan revealed a possible nasal fracture, warranting

---

[1] Computerized Axial Tomography.

A-4950-17T2

a plastic surgery consultation by the emergency room physician. A CT scan also revealed a herniated disc in plaintiff's cervical spine.

Nine days after the accident, plaintiff sought treatment with Marc Cohen, M.D., an orthopedic spinal surgeon, who ordered an MRI[2] of his cervical spine. The MRI revealed multiple cervical disc herniations. Because of plaintiff's complaints of neck, lower back, left shoulder, and interscapular pain, Cohen prescribed pain medication and physical therapy at Kessler Rehabilitation Center (Kessler). Plaintiff described the physical therapy as "too excruciating" and that it felt "like people were just taking knives stabbing [him] in the back of the neck, stabbing [him] in the shoulder." He became "either bedridden or walking around in a lot of pain[,]" and was unable to work in his occupation as a property manager, renovating foreclosed homes.

On June 14, 2010, plaintiff consulted with Damian Sorvino, M.D., an otolaryngologist, complaining of "excruciating pain," difficulty breathing, and restless sleep due to nasal pain following the accident. Sorvino testified plaintiff had "a very deviated nose and a very deviated septum, the septum being the central aspect of the nose, which was very shifted over." Plaintiff complained

---

[2] Magnetic resonance imaging.

A-4950-17T2

of "a significant change in the breathing with his nose, in addition to the change in shape." He also reported suffering from migraine headaches and facial swelling. To address these conditions, Sorvino performed a closed reduction of the nasal septal fracture under general anesthesia on plaintiff on June 17, 2010. The surgery involved "manipulating the [nasal] bones back in[to] position." Following surgery, plaintiff was required to wear a cast, affixed with tape and glue, for four days until his follow-up visit. After continuing to complain of difficulty breathing, Sorvino testified that a patient needs "to let it all settle out[,]" and heal for at least six months before a true analysis of the surgery's success can be assessed. During a follow-up visit on April 19, 2011, plaintiff continued to complain of an inability to breathe properly.

Sorvino testified that plaintiff's case was within the five percent of unsuccessful closed reduction nasal septal fracture cases. Based on plaintiff's continued complaints, Sorvino performed a "nasal septal reconstruction and a partial turbinectomy" on September 29, 2011. Sorvino explained that first, the nose is "rebroken . . . so you can actually manipulate the bones back into a more midline position[,] in addition to fixing the septal," and the second part of the surgery involves reducing the size of the turbinates, the structural walls of the

6

nose, because they could contribute to the nasal blockage. This is "a much bigger surgery[,]" according to Sorvino.

Plaintiff was evaluated post-operatively by Sorvino on September 30, October 4, 2011 and June 19, 2012. As of June 2012, plaintiff's nose was straight but he was still complaining of nasal blockage. Sorvino indicated that a third surgery might be necessary because the "left interior turbinate was still a little large."

In September 2012, plaintiff was convicted of wrongful possession and attempted sale of a rifle, resulting in a mandatory three-and-a-half year prison sentence under the Graves Act.[3] Because of his incarceration, he was unable to receive the medical treatment he required despite his requests to prison officials, according to plaintiff's testimony. His neck pain and breathing issues persisted. He was released in January 2016.

Due to this period of incarceration on charges unrelated to the accident, plaintiff did not return to Sorvino until April 26, 2017 and he continued to complain of nasal blockage. On May 24, 2017, Sorvino performed an endoscopy "to examine all of the little confines of the nose." Sorvino testified the procedure revealed that plaintiff "still had a very significant deviated septum[,]" the middle

---

[3] N.J.S.A. 2C:43-6(c).

vault of his "nose was still shifted over the left side," and the turbinates were not affected by an initial trauma, but are "related to the whole nasal blockage complex[,]" and should be further reduced.

Sorvino testified that plaintiff will always "complain[] of some aspect of nasal blockage. Sometimes when you have nasal trauma and there's been a change in the shape of the nose, even with corrective nasal surgery . . . there will often be some complaint of blockage." He opined that plaintiff's nasal injuries were causally related to the accident.

Plaintiff was evaluated by Louis G. Quartararo, M.D., an orthopedist specializing in spinal surgery. Following this examination, Quartararo determined that plaintiff was experiencing muscle tenderness and spasms in his cervical spine and noted plaintiff had a positive Spurling test a, "nerve root compression sign[,]" and when a nerve is pinched by a disc, "it pinches it a little bit more and it can . . . recreate pain and radiating in the arm or numbness and tingling . . . ." Quartararo ordered a follow-up cervical MRI, which revealed multiple cervical disc herniations and a very significant spinal cord encroachment from two of the four herniated discs, resulting in a "complex problem." Plaintiff testified that at the time of his consultation with Quartararo,

A-4950-17T2

he was feeling "horrible"; had difficulty getting dressed; and that his neck was "absolutely still killing" him.

Because of his persistent complaints, Quartararo referred plaintiff to Ning Ning He, M.D., a pain management specialist. He administered three cervical epidural injections and one cervical facet block injection, but plaintiff's "posterior neck pain radiating" through his left shoulder persisted. Chiropractic treatments also provided plaintiff no relief. Due to plaintiff's ongoing symptoms, Quartararo ordered a discogram, which He performed.[4] This test is designed to "provoke pain" according to Quartararo, and is invasive in nature. Ultimately, plaintiff underwent an anterior cervical discectomy and fusion at two levels on June 23, 2017.[5]

---

[4] "Cervical provocation discography, an image-guided procedure in which a contrast agent is injected into the nucleus pulposus of the intervertebral disc, includes disc stimulation and morphological assessment. It is intended to both identify a painful cervical intervertebral disc and depict internal derangement." Obi Onyewu et al., An Update of the Appraisal of the Accuracy and Utility of Cervical Discography in Chronic Neck Pain, 15 Pain Physician J. 777, 778 (2012).

[5] The procedure is described as follows:

> [An] [i]ncision is made in the front of the spine through the throat area. After the disc is removed, a bone graft is inserted to fuse together the bones above and below the disc space. Discectomy literally means "cutting out

A-4950-17T2

A titanium plate, six screws, and a spacer – called a cage – were inserted into plaintiff's cervical spine and a bone graft from his hip was implanted into his cervical spine. Quartararo testified that plaintiff was prescribed a bone stimulator collar post-surgery that plaintiff had to wear for four hours a day for six or seven months prior to the time of trial. The screws will remain implanted for the rest of plaintiff's life and the hardware permanently changed his cervical spine, as testified to by Quartararo, leaving plaintiff with an "abnormal" neck

the disc." A discectomy can be performed anywhere along the spine from the neck (cervical) to the low back (lumbar). The surgeon reaches the damaged disc from the front (anterior) of the spine through the throat area. By moving aside the neck muscles, trachea, and esophagus, the disc and bony vertebrae are exposed . . . . Depending on [the] particular symptoms, one disc (single-level) or more (multi-level) may be removed. After the disc is removed, the space between the bony vertebrae is empty. To prevent the vertebrae from collapsing and rubbing together, a spacer bone graft is inserted to fill the open disc space. The graft serves as a bridge between the two vertebrae to create a spinal fusion. The bone graft and vertebrae are fixed in place with metal plates and screws.

[Anterior Cervical Discectomy with Fusion, Two Levels, St. George Surgical Center, https://www.sgsc.net/procedure/anterior-cervical-discectomy-fusion-two-levels/ (last visited Apr. 4, 2019).]

10

A-4950-17T2

and cervical discs that will never "be normal and they're never [going to] function normally, even in the best of outcomes." Quartararo indicated that the fusion will lead to future problems caused by "junctional breakdown," because the surrounding discs "start doing more of the motion and more of the work of the fused disc, and what happens is they actually wear out faster[,]" at a rate of about five percent each year. Quartararo further opined that "the long-term consequence" of fusion surgery is breakdown of the adjacent discs. Aesthetically speaking, Quartararo testified, "When you're looking [at the plate] from the side you see the screws sticking out and you see the cages a little bit better" and if "[y]ou're looking at the front of the plate and the screws are going in you can see those screws here." To a degree of medical certainty, Quartararo concluded that plaintiff's cervical spine injury was proximately caused by the accident and has resulted in a permanent functional loss and motor deficit. Plaintiff continues to suffer from numbness in his arms, weakness in his upper extremities, and permanent neurological deficits. Encompass did not request any independent medical examinations of plaintiff and did not proffer any medical expert at trial.

The first jury found: (1) plaintiff proved "by a fair preponderance of the evidence, that an unidentified driver was negligent[,]" unanimously; (2) plaintiff

proved "by a preponderance of the evidence, that the unidentified driver's negligence was a proximate cause of" plaintiff's injuries, by a five to one vote; and (3) plaintiff proved "by a fair preponderance of the objective credible medical evidence that he sustained either a displaced fracture and/or a permanent injury[,]" unanimously, and awarded $25,000 in compensatory damages. Plaintiff filed a notice of motion for a new trial and/or additur on February 9, 2018, which Encompass opposed. The trial judge conducted oral argument on plaintiff's motion on March 16, 2018, and entered an order on March 26, 2018, granting plaintiff a new trial on damages only.

Encompass sought interlocutory appellate review, which we denied. The same trial judge presided over the re-trial on damages before a new jury. The second jury returned a verdict in favor of plaintiff in the sum of $350,000. The judge calculated and ordered prejudgment interest, in the amount of $19,238.36, to be added to the jury's verdict, for a grand total of $369,238.36, applying Rule 4:42-11(b) prejudgment interest rates.

On appeal, Encompass argues that the trial judge erred in granting plaintiff's motion for a new trial, the $350,000 jury award from the second trial should be vacated and the first jury's $25,000 award should be reinstated. Encompass further argues that the original verdict was not contrary to the weight

of the evidence, the trial judge misapplied the legal standard for a new trial, and the judge acted as a thirteenth juror by determining plaintiff sustained a permanent injury.

II.

First, Encompass argues that the trial judge improvidently granted a new trial. Appellate review of a "trial court's decision on a motion for a new trial is substantially the same as that controlling the trial court except that due deference should be made to its 'feel of the case,' including credibility." Caldwell v. Haynes, 136 N.J. 422, 432 (1994) (quoting Feldman v. Lederle Labs., 97 N.J. 429, 463 (1984)). Pursuant to Rule 4:49-1(a):

> [a] new trial may be granted to all or any of the parties and as to all or part of the issues on motion made to the trial judge. . . . The trial judge shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law.
>
> [(Emphasis added).]

"A 'judge may not substitute his [or her] judgment for that of the jury merely because he [or she] would have reached the opposite conclusion[,]'" because the judge may not act as a thirteenth juror. Cuevas v. Wentworth Grp.,

226 N.J. 480, 501 (2016) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977)).  We give "considerable deference" to a jury verdict, and it

> "should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice."  That is, a motion for a new trial "should be granted only where to do otherwise would result in a miscarriage of justice shocking to the conscience of the court."
>
> [Little v. Kia Motors Am., Inc., 455 N.J. Super. 411, 425 (App. Div. 2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011)).]

A motion for a new trial on damages should not be granted unless the damages verdict is "so disproportionate to the injury and resulting disability shown as to shock [the court's] conscience and convince [it] that to sustain the award would be manifestly unjust."  Baxter, 74 N.J. at 596; see also Cuevas, 226 N.J. at 510.  A motion for new trial must be filed within twenty days after a jury verdict is issued.  R. 4:49-1(b).  Here, the first jury verdict was rendered on January 23, 2018, and plaintiff timely filed his motion for new trial and/or additur on February 9, 2018.

In ordering a new trial on damages, the judge found that "[p]laintiff sufficiently presented the jury with the magnitude of his injuries sustained in the

accident, the subsequent years of physical infirmities, the number of medical treatments and surgical procedures undergone as a result of those injuries, and the issues he currently still faces on a daily basis." The judge also noted the "copious amount of medical evidence presented by [p]lantiff in the matter[,]" which went "largely unrefuted by the defense."

The judge aptly held that plaintiff's medical history "along with the jury's determination that the unidentified driver was [a] proximate cause of [p]laintiff's injury in this case, clearly show that the jury's verdict was in direct contravention with the facts presented at trial." He held that an award of $25,000 was a miscarriage of justice because plaintiff's life expectancy was 37.8 more years,[6] amounting to $1.80 per day, "approximate to the daily cost of a candy bar." Because there was "no trial error affecting liability and because the issue of liability was sufficiently established in the original trial[,]" the trial judge limited the new trial to damages only. We agree with the judge's analysis of the evidence.

In Cuevas, our Supreme Court rejected the premise set forth in He v. Miller, 207 N.J. 230, 250-51 (2011), which allowed judges to rely on their own

---

[6] See Life Expectancies for All Races and Both Sexes, Pressler & Verniero, Current N.J. Court Rules, Appendix I to R. 1:13-5 (2019).

common knowledge, plaintiff's life expectancy, as well as their experience with other injury verdicts, as long as a factual analysis of how the award is similar or different to others to which it is compared was included. 226 N.J. at 503. The Cuevas Court amended this premise, holding "[t]he standard is not whether a damages award shocks the judge's personal conscience, but whether it shocks the judicial conscience." Id. at 486. Our Court found that "singular facts and particular plaintiffs in different cases that lead to varying awards of damages are not easily susceptible to comparison[,]" and that a true comparative analysis would be required to sufficiently compare information about each case and each plaintiff. Id. at 486-87.

In Von Borstel v. Campan, 255 N.J. Super. 24, 27 (App. Div. 1992), we affirmed the granting of a new trial for damages where plaintiff was awarded $50,000 in compensatory damages and $750 in punitive damages. There, the plaintiff was struck in the head with a flashlight by a New Jersey Transit employee and suffered "multiple contusions and a depressed skull fracture which required two neurological procedures to repair. Plaintiff also suffer[ed] from a post-traumatic seizure disorder and is required to take anti-convulsant medication to control his seizures." Id. at 26. Plaintiff moved for additur or alternatively, a new trial on damages, and the latter was granted. Id. at 27. We

held: "[T]he severity of his injuries, their permanent effects and medical procedures required to treat the same support the trial court's conclusion that the jury's compensatory damages verdict was shockingly low and a miscarriage of justice." Id. at 29.

In accordance with the analysis supported by Baxter, the judge considered plaintiff's testimony regarding his constant pain, shortness of breath, difficulty breathing, and an inability to return to his past employment, or any other substantive full-time work. The judge specifically addressed plaintiff's two surgeries under general anesthesia for his nasal issues, as well as an endoscopy, three cervical procedures, dozens of chiropractic and physical therapy sessions, and that he continues to wear a bone stimulator four hours a day. Reviewing this matter with the same lens as the trial court, an award of $25,000 for plaintiff's injuries is a miscarriage of justice under law and shocks the judicial conscience.

### III.

Encompass next argues that the trial judge misapplied the legal standard necessary to grant a new trial for damages. "Judicial review of the correctness of a jury's damages award requires that the trial record be viewed in the light most favorable to [non-movants]." Cuevas, 226 N.J. at 488. We owe deference

17

"to the trial court's 'feel of the case,' given that, on appeal, review is confined to the 'cold record.'" Berkowitz v. Soper, 443 N.J. Super. 391, 412 (App. Div. 2016) (quoting Johnson v. Scaccetti, 192 N.J. 256, 282 (2007), abrogated on other grounds, Cuevas, 226 N.J. at 506). This "'feel of the case' factor . . . is the only element distinguishing the standard governing appellate review from that controlling trial reaction to a jury verdict." Jackowitz v. Lang, 408 N.J. Super. 495, 504 (App. Div. 2009) (quoting Johnson, 192 N.J. at 282).

At Encompass's request, the judge addressed the verbal threshold issue:

> In order to recover damages in this case the plaintiff must prove by a preponderance of the evidence that he sustained injuries which fit into one or more of the following categories: category one is displaced fracture; category two is permanent injury within a reasonable degree of medical probability other than scarring or disfigurement.
>
> If you find that the injuries caused by the accident do not come within one of these two categories, your verdict must be for the defendant. If you find that the injuries caused by the accident do come within one of those categories, your verdict must be for the plaintiff.
>
> In addition to the displaced fracture, the plaintiff also alleges that he suffered a permanent injury as a result of the motor vehicle accident. An injury shall be considered permanent when the . . . body part or organ or both has not healed to function normally and will not heal to function normally with further medical treatment.

A-4950-17T2

The verbal threshold statute, N.J.S.A. 39:6A-8(a), requires a plaintiff to prove one of six injuries in order to recover: death; dismemberment; significant disfigurement or significant scarring; displaced fractures; loss of a fetus; or a permanent injury within a reasonable degree or medical probability, other than scarring or disfigurement.

The first jury returned a unanimous verdict finding that plaintiff proved "by a fair preponderance of the objective credible medical evidence that he sustained either a displaced fracture and/or permanent injury as a result of the collision." Encompass claims the jury's response to this question is unclear as to whether plaintiff effectively established a displaced fracture, permanent injury, or both. Notably, Encompass did not challenge or object to the jury verdict sheet.

In granting the new trial, the judge found that "plaintiff provided [the jury as factfinder] not only with a substantial accounting of his daily breathing issues, but also with a tremendous amount of undisputed medical evidence demonstrating the impact of the accident on [p]laintiff's overall health and livelihood." The judge noted that these proofs also "went largely unrefuted by the defense." The judge found this to be a miscarriage of justice.

A-4950-17T2

Encompass argues that if plaintiff only proved a nasal fracture, then it was improper for the judge to assume plaintiff also proved a permanent spinal injury. Further, assuming that plaintiff only established a nasal fracture, which Encompass contends was fully resolved, then the $25,000 award was "more than reasonable." The judge entertained this argument when deciding whether to grant a new trial, and rightfully rejected it. Encompass asks us to accept that the first jury rendered its determination based on the nasal injury alone, in direct contradistinction of its argument that we should not assume the jury considered the serious cervical injuries in its decision. We disagree. Jury deliberations are sacrosanct and we will not question any breakdown of the compensatory damages verdict. Moreover, plaintiff's injuries did not have to be separated out on the verdict sheet.

"Once the trial court determines that a 'manifest denial of justice' has occurred, a new trial is warranted." Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 490 (2001) (quoting Baxter, 24 N.J. at 597-98). A new trial is proper when the trial court determines that the verdict is "contrary to the weight of the evidence or clearly the product of mistake, passion, prejudice, or partiality." Lanzet v. Greenberg, 126 N.J. 168, 175 (1991). The nature of the injustice will

determine the scope of the new trial. The same standard is applied on review of whether a damages award is excessive. Cuevas, 226 N.J. at 501.

> Where trial error affecting liability occurs, the new trial will encompass all issues. See Carey v. Lovett, 132 N.J. 44, 63, 68, 70 (1983) (verdict required new trial on liability and damages where it resulted from trial court's obvious impermissible bias toward plaintiffs throughout trial). Where the quantum of damages is the sole source of the court's determination that a denial of justice has taken place, other remedies are available including remittitur and additur. Velop, Inc. v. Kaplan, 301 N.J. Super. 32, 42, 62-64 (App. Div. 1997) (allowing plaintiff to accept remittitur or submit to new damages trial); Bishop v. Harski, 191 N.J. Super. 109, 112-14 (Law Div. 1983) (allowing defendant to submit to additur or face new damages trial).
>
> [Fertile, 169 N.J. at 490-91 (footnote omitted).]

Here, the first jury unanimously decided the phantom driver was 100% negligent, and that the accident was the proximate cause of plaintiff's injuries. Encompass does not contest the jury's liability determination, and an additur was not agreed to, thereby making a new trial limited to damages the proper and only remedy.

Our role "in assessing a jury verdict for excessiveness is to assure that compensatory damages awarded to a plaintiff encompass no more than the amount that will make the plaintiff whole." Besler v. Bd. of Educ. of W. Windsor–Plainsboro Reg'l Sch. Dist., 201 N.J. 544, 577 (2010) (quoting Jastram

A-4950-17T2

v. Kruse, 197 N.J. 216, 228 (2008), abrogated on other grounds, Cuevas, 226 N.J. at 506). The judge should:

> [E]valuate the nature and extent of the injury, the medical treatment that the plaintiff underwent and may be required to undergo in the future, the impact of the injury on the plaintiff's life from the date of injury through the date of trial, and the projected impact of the injury on the plaintiff in the future.
>
> [Jastram, 197 N.J. at 229.]

Encompass further claims that the judge was required to assume that "plaintiff failed to demonstrate that the unanimous original jury award was contrary to the weight of the evidence or clearly the product of mistake, passion, prejudice or partiality[,]" and instead found plaintiff suffered a permanent spinal injury. But the judge's reference to plaintiff's cervical injuries was properly considered:

> [Encompass] argues that the long gap in treatment between [p]laintiff's nasal surgery in 2010 – 2011 and the cervical surgery in 2016 shows that [p]laintiff is not credible in his complaints that the cervical surgery in 2016 is related to the motor vehicle accident in 2010. However, [p]laintiff did explain that he needed to deal with his breathing problems first and, shortly after treating those issues, went to New Jersey State Prison for several years for the unlawful sale of a firearm. Within six months of his release from prison, [p]laintiff sought treatment from [] Quartararo. Furthermore, [] Sorvino verified that [p]laintiff had to undergo two

surgical procedures for his breathing issues, and at present still has issues with respect to his breathing.

As stated previously, Encompass did not request that plaintiff undergo any independent medical examinations and it provided no contrary evidence to refute plaintiff's medical experts' testimony. And Encompass presented no proofs to indicate that the prison where plaintiff was incarcerated could evaluate and treat his nasal and cervical injuries. These unrefuted facts, even viewed in the light most favorable to Encompass, justified a new trial on damages because the uncontroverted expert evidence confirmed that plaintiff's injuries were objective, serious, disabling, and permanent.

IV.

In its final argument, Encompass argues that the judge improperly acted as a thirteenth juror. We disagree. As stated above, a judge may not substitute his or her opinion "for that of the jury merely because he [or she] would have reached the opposite conclusion; [the judge] is not a thirteenth and decisive juror." Baxter, 74 N.J. at 598 (quoting Dolson v. Anastasia, 55 N.J. 2, 6 (1969)). The trial judge found, "as a threshold matter, this [c]ourt has determined [p]laintiff to be correct in his renditions and accounting of the facts." We disagree with Encompass that this was an inappropriate credibility finding by the trial judge. When ruling on a motion for new trial, "the trial judge takes into

23

account, not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, so-called 'demeanor evidence,' and the intangible 'feel of the case' which [the judge] has gained by presiding over the trial. Velop, 301 N.J. Super. at 48 (quoting Dolson, 55 N.J. at 6).

Plaintiff consulted Cohen nine days after the accident and began treatment, but due to extreme pain, plaintiff terminated same. Plaintiff also underwent three nasal procedures in 2010 and 2011, including follow-up visits in June 2012, three months before he was incarcerated, making Encompass' argument factually incorrect. The judge found that "[p]laintiff was even able to explain certain credibility issues that arose with respect to his injuries and related treatments." Encompass contends these conclusions "evidence[] that the trial judge was not sitting as a neutral party nor viewing the evidence in the light most favorable to the party opposing the motion, while cognizant that reasonable minds might accept the evidence as adequate to the support the jury[,]" citing to Kozma[7] and Kulbacki.[8]

---

[7] Kozma v. Starbucks Coffee, Co., 412 N.J. Super. 319 (App. Div. 2010).

[8] Kulbacki v. Sobchinsky, finding:

In <u>Kozma</u>, this court reaffirmed that " [a] jury verdict, from the weight of the evidence standpoint, is impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice." 412 N.J. Super. at 324 (quoting <u>Doe v. Arts</u>, 360 N.J. Super. 492, 502-03 (App. Div. 2003)). However, in reviewing this case with the same standard of review as the trial court, that is, whether "it clearly and convincingly appears that there was a miscarriage of justice under the law[,]" the trial judge did not err. <u>R.</u> 4:49-1(a).

Plaintiff testified that he has been unable to return his previous work, which involved contracting and performing renovations on homes, or to any

<hr>

the trial judge must . . . canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict . . . to determine "if the verdict be so far contrary to the weight of the evidence as to give rise to the inescapable conclusion of mistake, passion, prejudice, or partiality" so that "it cannot serve to support the judgment[.] If reasonable minds might accept the evidence as adequate to support the jury verdict, it cannot be disturbed by the trial court.

[38 N.J. 435, 445 (1962) (citation omitted) (quoting <u>Hager v. Weber</u>, 7 N.J. 201, 210 (1951), <u>overruled in part, on other grounds</u>, <u>Dolson</u>, 55 N.J. at 8).]

other full-time work, which corroborates the seriousness of his injuries.  He also testified as to his daily sequelae resulting from the accident, such as limited range of motion, difficulties getting dressed, lifting more than ten pounds, and continued breathing problems, all of which went unrefuted by Encompass.

We are satisfied that the judge considered the proofs before the first jury and properly granted plaintiff's motion for a new trial.  The injuries plaintiff sustained were substantial and will have a considerable impact on his life.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION